**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PJM-10-0295** |
| | * | |
| **NADER MODANLO, et al.** | * | |

**...ooOoo...**

**GOVERNMENT'S MOTION TO CONTINUE TRIAL DATE TO PERMIT COMPULSORY DEPOSITIONS OF SWISS WITNESSES**

Comes now the United States of America, by and through undersigned counsel, and hereby moves for a continuance of the current October 16, 2012 trial date and states as grounds the following:

**FACTUAL HISTORY**

Defendant Nader Modanlo and five others were indicted on June 2, 2010 by a federal Grand Jury in Greenbelt of one count of conspiracy in violation of 18 U.S.C. § 371, three counts of violating the International Economic Emergency Powers Act (IEEPA), in violation of 50 U.S.C. § 1705(b) and its attendant regulations, six counts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, and a related forfeiture charge, stemming from an alleged scheme to provide satellite-related goods and services to Iran in violation of the Iran Trade Embargo. On or about November 10, 2010, a Superseding Indictment was returned, adding to the original charges certain counts related to bankruptcy fraud.

**1. The Facts as Alleged in the Indictment**

In or about 1992, Nader Modanlo and a partner incorporated Final Analysis, Inc. ("FAI") in Maryland. Modanlo was a principal owner and served as chairman and president. In or about 1993, Final Analysis Communications Services ("FACS") was organized in Maryland as a subsidiary of

FAI to construct, launch and operate a constellation of low earth orbit satellites for global wireless communications ("FAI satellites" or "FAISAT"). FAI served as the general contractor to the FAISAT system. Nader Modanlo was president of FACS. He and approximately fifty other persons invested in FACS. In or about November 2001, shortly after FAI declared bankruptcy, Modanlo established New York Satellite Industries, LLC ("NYSI"), a Delaware limited liability company. NYSI purchased FAI's assets and held a majority of FACS stock. Modanlo served as Chairman and Managing member of NYSI, and used his home address as NYSI's business address.

In or about 1994, FAI entered into a contractual relationship with a Russian government-owned company known as POLYOT to build and launch FAI satellites. On or about January 24, 1995, FAI became the first American company to launch a commercial satellite from a Russian launch facility. The first satellite was known as FAISAT-1. POLYOT provided the launch services for FAISAT-1. Between January 1995 and 1997, FAI and POLYOT designed and constructed a second satellite, FAISAT-2v, which FAI and POLYOT launched on September 23, 1997. Between September 1997 and September 1999, FAI and POLYOT designed and constructed an in-orbit communications system, known as FAISAT-3v, which FAI and POLYOT launched using the Russian COSMOS rocket launcher in July 2000.

In or about 2000, Iranian officials arranged to visit POLYOT's satellite and launch production facilities in Russia to discuss potential future cooperation. In addition, Iranian officials met with Modanlo in Moscow and elsewhere to facilitate Iranian contact with POLYOT. At that time, Modanlo, POLYOT officials and Iranian officials met to discuss a Russian-Iranian satellite agreement.

In or about December 2001, POLYOT and Iranian officials reached an agreement for the design, development, assembly, integration, test and launch of a small low-earth orbiting spacecraft named SMALL-SAT and the installation of a ground station ("the SMALL-SAT Agreement").

Between December 2001 and April 2002, Modanlo and certain Iranian officials traveled to Switzerland to visit the law firm of Hausheer and Partner in order to form a front company, known as Prospect Telecom ("PT"), to conceal the Iranians' involvement with Modanlo. Shortly thereafter, PT was formed with 1000 shares of stock, 9998 of which were owned by Urs Hausheer himself and two of which were owned by two other Hausheer employees. The beneficial owners of PT were Heidari, Modares and Mehrdad**,** three Iranians also charged in the Superseding Indictment. After PT's formation, its shares were immediately transferred to a company known as Saul Morrisson Trade and Finance to further conceal Iranian involvement.

In June 2002, approximately $10 million was wired into the Swiss PT bank account and then wired out of that account in Switzerland to NYSI in the United States. Once the loan was wired to NYSI, Modanlo moved large sums of the money into accounts for FACS and, in one case, moved the money from the NYSI account to the FACS account and then back to the NYSI account. He also purchased a $500,000 annuity and made at least 2 payments totaling approximately $800,000 to 2 Russian bank accounts in the name of the Russian company POLYOT.

After NYSI declared bankruptcy in or about 2006, the trustee in charge of the bankruptcy became aware of the $10 million transfer and began to question Modanlo in 2007 about its origin. Modanlo denied significant knowledge of PT and its beneficial owners, despite his involvement in the formation of PT.

**2. The MLAT Process**

The instant charges stem from a multi-year investigation that included evidence gathering overseas, in anticipation of charging certain violations of US law. To assist in the investigation and prosecution of the defendant, the United States made a formal request on or about January 25, 2006, to the Government of Switzerland, pursuant to a Mutual Legal Assistance Treaty in effect between the two countries,[1] for assistance in its investigation of Nader Modanlo and others (hereafter "Swiss MLAT Request"). The Swiss MLAT request sought certain types of information, including documents related to the formation of PT. The Swiss MLAT request also included a specific request to obtain the testimony of numerous Swiss persons, including but not limited to, Urs Hausheer, the partner in the Swiss law firm responsible for the formation of PT. The United States was permitted to interview certain Swiss witnesses, including Mr. Hausheer, in October 2009 in Switzerland, prior to the instant Superseding Indictment. At that time, Mr. Hausheer and another witness indicated their willingness to testify in the United States at trial.

Swiss documents, including significant materials provided by Mr. Hausheer on behalf of his law firm, were made available to the United States in December 2008 ("the 2008 Swiss response"). Many of these materials were provided by the Swiss in original German and French and thus required translation. Much of the 2008 Swiss response materials made available to the Untied States were provided to the defendant in discovery on November 30, 2010; certain of the materials that were sent out for translation were then provided on or about September 2, 2011. *See* Exhibit 2.

---

[1] *See* the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters, which entered into force January 23, 1977, T.I.A.S. No. 8302, 27 U.S.T. 2019, 1977 WL 181784 (U.S. Treaty)(attached hereto as Exhibit 1).

### 3. **The Swiss MLAT As It Pertains to the Appearance of a Witness**

Article 23 of the MLAT between the Swiss and the United States provides for the personal appearance of a person in a requesting State, and allows for the executing authority to "invite the person to appear before the appropriate authority in the requesting State and ask whether he agrees to appear." A person may be compelled to provide testimony or documents only if (1) the request concerns the investigation or prosecution of a serious offense; (2) the disclosure is of importance for obtaining or proving facts which are of substantial significance for the investigation or proceeding; and, (3) reasonable but unsuccessful efforts have been made in the United States to obtain the evidence or information in other ways. *See* 1977 WL 181784 (U.S. Treaty), at Articles 25 and 10, attached at Exhibit 1.[2]

According to information available to the United States, the process of securing testimony pursuant to the law of a requesting state requires that the U.S. Government in this case first invoke Article 23 – that is, the Swiss persons must first be invited to voluntarily provide the necessary testimony – before it can seek Swiss assistance in compelling such testimony.

The process of seeking depositions in this case was made known to defense counsel at the time of the discovery disclosure in November 2010 of the 2008 MLAT response. Depositions of witnesses like Hausheer were part of the 2006 MLAT request to Switzerland. At the request of the Swiss Government, the U.S. Government subsequently requested formally on August 9, 2011 that the Swiss Government ask the deponents to voluntarily submit to depositions. *See* Exhibit 3. The U.S. Government reiterated its request on February 7 and March 23, 2012, and further asked about

[2]The U.S. Swiss Treaty language also presumes that a witness cannot be compelled to testify is he "has a right to refuse," i.e., that he is a target of the investigation. *See* Article 10(1).

their availability for the latter part of 2011 or the early part of 2012. *See* Exhibits 4 and 5 hereto. The time frame for the requested depositions was done in part to permit the defendant to have the opportunity to review the Swiss materials and determine whether a pre-trial disposition was possible before Swiss depositions were requested.

**4. Defense Communications With the Swiss Prosecutor**

Prior to the time the Swiss prosecutor intended to send a communications to the Swiss witnesses for their voluntary participation in a deposition taken pursuant to U.S. law, the defendant in this case sent two communications with the Swiss Government: (1) a letter dated April 3, 2012 (see Exhibit 6), setting forth the defendant's refutation of the Government's case and arguing that Swiss assistance was inappropriate because of the absence of dual criminality in the charges levied in the Superseding Indictment;[3] and, (2) a Powerpoint presentation sent directly to the Swiss prosecutor on or about June 5, 2012 (*see* Exhibit 7), again arguing, *inter alia,* that the United States misled the Swiss Government because no dual criminality existed. In addition, and perhaps most significantly, both the Letter and the Powerpoint suggested – incorrectly– to the Swiss prosecutor that because the witnesses potentially face charges in the United States, they should not testify.[4]

---

[3] In fact, the defendant went so far in his letter to accuse the Government of asking for Swiss assistance "pursuant to a false or outdated representation by the United States Government." *See* p. 5 of April 3, 2012 Letter. The issue of dual criminality was briefed extensively for this Court in Docket Nos. 67 (Defendant's Motion to Compel MLAT Discovery) and 80 (Government's Consolidated Motion in Opposition).

[4] The claim that such witnesses might face charges in the United States is disingenuous, as the very language of the U.S.-Swiss Treaty states that the United States may only request the personal appearance of a Swiss witness in the United States, so long as he/she is not a "defendant in the criminal proceeding to which the request relates" (Art. 23). Moreover, the treaty makes clear that a Swiss witness also may not be compelled to testify if he has "a right to refuse," i.e., a right against self-incrimination, under the law of either state (Art. 10). At the request of the Swiss Government, the United States also has agreed to depose the witnesses in Switzerland.

On or about July 5, 2012, the Swiss prosecutor informed the U.S. Government that the requested deponents, Mr. Hausheer and Mr. Schilter, had decided not to agree to depositions either in Switzerland or in the United States, even though the witnesses had previously explicitly agreed, or otherwise indicated, that they would cooperate with the United States. It is not clear whether any of the defendant's information was communicated to the Swiss witnesses, but the U.S. Government did learn that individuals alleging an association with Modanlo had earlier communications with Hausheer suggesting that the case against Modanlo had been dropped. *See* September 15, 2008 e-mail, attached hereto as Exhibit 8. It is not clear how such communications may have affected the witnesses' recent decision not to agree to depositions.

The Government submits that the April 3, 2012 Letter and the June 5, 2012 Powerpoint do not properly portray the state of the U.S. Government's prosecution, insofar as they incorrectly characterize the issue of dual criminality and incorrectly suggest possible prosecution of Swiss witnesses. In short, the defendant's actions have altered the course of the depositions and now necessitate a continuance. The Swiss prosecutor has informed the Untied States that the delay in asking for and obtaining permission to conduct the depositions, in receiving a response from the Swiss witnesses, and in now seeking an Order compelling their testimony, have been occasioned in part by the defendant's dual criminality filings, which now require additional response before any further action can be taken. The Defendant's communications with the Swiss prosecutor appear to have been designed to delay the Swiss decision to cooperate with the United States, while at the same time forcing the October 16 trial date, thereby denying the Government the benefit of its critical witnesses. Such tactics are unjust.

**The Basis For Seeking Depositions of the Swiss Witnesses**

The basis for seeking the depositions of Hausheer and Schilter originates with the 2008 Swiss response materials, which the Government alleges made it clear that Modanlo and other co-conspirators met in Switzerland with Hausheer, Schilter and others at Hausheer & Partner in order to form Prospect Telecom. Although certain materials available in the 2008 Swiss response as certified business records attest to the actual formation, the testimony of the witnesses is expected to bring to light the conversations and discussions among co-conspirators as to the basis for forming PT in Switzerland, so as to avoid the Iranian transaction regulations that are at the heart of the charges brought against Nader Modanlo. The witnesses also are expected to testify regarding the defendant's brokering of defense services to Iran, and are critical to proving the element of knowledge underpinning the IEEPA, money laundering and bankruptcy fraud charges against the defendant. In short, the testimony of the Swiss witnesses is considered to be at the heart of the allegations in the Superseding Indictment[5]

At the time the Swiss witnesses declined to further assist the United States, the Swiss prosecutor indicated his willingness to issue compulsory process against Hausheer and Schilter. The process of seeking to compel the testimony of Swiss witnesses in Switzerland appears to involve the following steps: (1) the U.S. Government is required to address the absence of dual criminality allegations raised with the Swiss prosecutor in a formal, written response, because Swiss courts will require a response from the U.S. government in support of an order of compulsion. The U.S. Government has agreed to prepare such a response on or before August 20, 2012; (2) once the Swiss

[5] The Swiss prosecutor recently was advised of certain evidentiary issues that preclude the U.S. Government from simply admitting any prior witness interviews as evidence at trial.

Government has received the response, it will review the allegations and if dual criminality exists, the Swiss prosecutor will seek to compel the testimony of the witnesses, Urs Hausheer and Arthur Schilter; (3) Swiss law provides the witnesses 30 days to appeal to the Federal Criminal Court in Switzerland any order the Swiss prosecutor obtains compelling such testimony and any Federal Criminal Court Order upholding the compelled testimony may be further appealed to the Swiss Supreme Court within 10 days of the Federal Criminal Court ruling.

The Swiss prosecutor has advised the undersigned U.S. prosecutors that the entire process can take several months and he has thus asked specifically that we now seek this continuance with the U.S. District Court. While it is unclear how long the process in Switzerland will actually take, once the appeals are completed, the parties to the instant prosecution must then agree to dates for scheduling the depositions in Switzerland. The Government expects to file a request for Rule 15 depositions in timely fashion to avoid unnecessary delay, assuming compelled testimony is ordered.

**The Delay Does Not Prejudice the Defendant**

The defendant in this case sought and received a 2-year continuance in late 2010, because of the anticipated voluminous discovery and the limited resources of the Office of the Public Defender. On or about July 27, 2010, this Court issued an Order pursuant to18 U.S.C. § 3161(h)(7), finding that the interests of justice warranted a delay in the trial, as requested by the defendant. The instant request would delay the trial only a few additional months, and is not based on bad faith, or the "lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government" or any other dilatory tactic that would undermine the basis for the Court's original continuance of the trial date. *See* 18 U.S.C. § 3161(h)(7)(c); *United States v. Trotman,* 406 Fed. Appx. 799, 806 (4th Cir. 2011). The defendant is not currently incarcerated.

Accordingly, the United States hereby respectfully moves for a 120-day continuance of trial to permit the Swiss prosecutor to seek compelled testimony from Swiss witnesses Urs Hausheer and Arthur Schilter.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:__________/s/_______________

David I. Salem
Emily N. Glatfelter
Assistant United States Attorneys
United States Attorney's Office
6500 Cherrywood Lane, Suite 400
Greenbelt, Maryland 20770
(301) 344-4433

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PJM-10-0295** |
| | * | |
| **NADER MODANLO, et al.** | * | |

**...ooOoo...**

**ORDER**

Having considered the Motion of the United States to continue trial for a period of 120 days to permit the Swiss Government to seek the compelled testimony of Swiss witnesses for trial, and there being good cause shown, it is this _________ day of August 2012

**HEREBY ORDERED** that the trial shall be continued for a period of 120 days, with the United States to advise this Court on or before November 30, 2012 of the status of Swiss legal action to compel such testimony, and it is

**FURTHER ORDERED** that the parties shall contact Chambers for a new trial date consistent with this Order.

___________________________
Peter J. Messitte
United States District Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of August 2012, I caused a copy of the foregoing Government's Motion for Continuance and Proposed Order to be sent ECF to counsel for Nader Modanlo:

**Lucius Outlaw, Esq.**
Assistant Federal Public Defender
Tower II, 9th Floor
100 South Charles Street
Baltimore, Maryland 21201-2705

**Elizabeth G. Oyer, Esq.**
Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101

/s/
David I. Salem
Assistant United States Attorney