**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PJM-10-0295** |
| | * | |
| **NADER MODANLO,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S MOTION TO CONDUCT DEPOSITIONS**
**PURSUANT TO FED. R. CRIM. P. 15**

The United States of America, by and through its attorneys, Rod J. Rosenstein, United

States Attorney for the District of Maryland, and David I. Salem and Stuart A. Berman, Assistant

United States Attorneys, respectfully moves the Court in connection with the above-captioned

case to authorize the deposition in Switzerland of three Swiss citizens:  attorney Urs Hausheer,

attorney Arthur Schilter, and Mehdi Zahedi, a banker and financial consultant.  The grounds for

this Motion follow.

**FACTUAL BACKGROUND**

Defendant Nader Modanlo and five others were indicted on June 2, 2010 by a federal

grand jury in Greenbelt.  The Second Superseding Indictment, relating solely to defendant

Modanlo, was returned on October 30, 2012.  The Second Superseding Indictment charges

defendant Modanlo in Count One under 18 U.S.C. § 371 with participating in a conspiracy to

defraud the United States and to commit an offense against the United States by violating three

specific provisions of the Iranian Transaction Regulations ("ITR").  Counts Two through Four

charge the defendant with violating the International Economic Emergency Powers Act

("IEEPA"), in violation of 50 U.S.C. § 1705(b) and its attendant regulations.  Counts Five

through Ten charge six counts of money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A)

(Count Five), and 18 U.S.C. § 1957 (Counts Six through Ten), stemming from an alleged scheme

to provide satellite-related goods and services to Iran in violation of the Iran Trade Embargo.

Count Eleven charges obstruction of bankruptcy proceedings, pursuant to 18 U.S.C.

§ 1512(c)(2).  The Second Superseding Indictment also contains a forfeiture allegation.

### 1.    The Pertinent Facts as Alleged in the Second Superseding Indictment

The Second Superseding Indictment alleges that defendant Modanlo was an Iranian-born

naturalized American citizen and a resident of Potomac, Maryland who was involved in the

satellite communications business.  In or about 1992, Modanlo and a partner incorporated Final

Analysis, Inc. ("FAI") in Maryland.  Modanlo was a principal owner and served as chairman and

president.  FAI was one of the first companies to launch a satellite from Russia.  In or about

1993, FAI set up a subsidiary, Final Analysis Communications Services ("FACS"), to construct,

launch and operate a constellation of low earth orbit satellites for global wireless

communications ("FAI satellites" or  "FAISAT").  FAI served as the general contractor to the

FAISAT system.  Modanlo served as president of FACS.  He and approximately 50 other persons

invested in FACS.  In September 2001, creditors filed a petition to place FAI into involuntary

Chapter 7 bankruptcy.  In November 2001, Modanlo established New York Satellite Industries,

LLC ("NYSI") as a Delaware limited liability company and, as Chairman and managing member

of NYSI, purchased FAI's assets and held a majority of  FACS stock.

POLYOT was an aerospace enterprise company owned by the Government of the

Russian Federation.  Its activities included constructing and launching telecommunications

2

satellites.  Beginning in or about 1994, FAI contracted to have POLYOT launch FAI satellites.

FAI planned to establish a constellation of satellites to provide data communication and other

telecommunication information to customers around the globe through licensing and service

provider agreements.  As required by law, Modanlo obtained United States export licenses for

the purpose of launching the FAI telecommunications satellites and other equipment from

Russia.  On or about January 24, 1995, an FAI commercial satellite was launched from a Russian

launch facility.  POLYOT provided launch services for the FAI telecommunications satellite,

which was known as FAISAT-1.   Between January 1995 and 1997, FAI and POLYOT designed

and constructed a second satellite, FAISAT-2v, which FAI and POLYOT launched on September

23, 1997.  In or about September 1999, FAI and POLYOT signed a contract to design and

construct an in-orbit communications subsystem, known as FAISAT-3v, which FAI and

POLYOT launched using a Russian rocket in or about July 2000.  Modanlo and other FAI

personnel personally met with POLYOT officials, including Vasily Gorlov ("Gorlov").

The indictment focuses in detail on Prospect Telecom AG ("Prospect Telecom"), an

entity incorporated in Switzerland in 2002 by the Swiss law firm of Hausheer and Partner

(referred to as the law firm of Attorney A in the charging document).  Prospect Telecom was

incorporated at the direction of defendant Modanlo and five co-conspirators, all of whom were

citizens of the Islamic Republic of Iran:   Hamid Malmirian, Sirous Naseri, Reza Heidari,

Mohammad Modares, and Abdol Reza Mehrdad.  By way of background, in or about 2000,

Malmirian and other Iranians arranged to visit POLYOT's satellite and launch production

facilities in Russia to discuss potential future cooperation.  In addition, Iranian officials,

including Malmirian, met with Modanlo in Moscow and elsewhere to facilitate Iranian contact

3

with POLYOT.   Modanlo, POLYOT officials, Malmirian and other Iranian citizens met to

discuss a Russian-Iranian satellite agreement.  In or about December 2001, POLYOT and Iranian

officials reached an agreement for the design, development, assembly, integration, test and

launch of a small low-earth orbiting spacecraft named SMALL-SAT and the installation of a

ground station ("the SMALL-SAT Agreement").

Between December 2001 and April 2002, Modanlo, Malmirian, Naseri, Heidari and

Modares traveled to Switzerland (referred to in the indictment as Foreign Country A) to form a

front company to conceal the Iranians' involvement with Modanlo.  To that end, between April

and June 2002, Naseri, Heidari, Modares, Mehrdad and Modanlo caused Prospect Telecom to be

formed in Switzerland.  To conceal their involvement with Prospect Telecom from others,

Heidari, Modares and Mehrdad engaged others to assume nominal control of Prospect Telecom

stock.  To further conceal their involvement in the formation and ownership of Prospect

Telecom, Heidari and Modares caused others to transfer their shares and interest in Prospect

Telecom to a French entity, Sarl Morrisson Trade and Finance, a/k/a Sarl Morrisson Trade &

Finance ("Sarl Morrisson").   Heidari, Modares and Mehrdad used French addresses to conceal

their connection to Prospect Telecom and Sarl Morrisson.  In fact, Heidari, Modares and

Mehrdad were the true and beneficial owners of Prospect Telecom.

Between May and June 2002, Naseri, Heidari, Modares, Mehrdad and Modanlo also

caused an account to be opened in the name of Prospect Telecom at Credit Agricole (referred to

in the indictment as Bank A) in Switzerland.  Naseri, Heidari, Modares, Mehrdad caused

approximately $10 million to be transferred into the Prospect Telecom account for the purpose of

providing funds to Modanlo and his company, NYSI.  The funds were transferred from four other

4

accounts, including an account controlled by Heidari.   On or about June 7, 2002, $10 million was wire transferred from the Prospect Telecom account in Switzerland to the NYSI account in Bowie, Maryland as consideration for Modanlo's assistance to Iran and the Government of Iran in connection with the SMALL-SAT Agreement and for providing telecommunications services in support of that Agreement.   On or about October 27, 2005, POLYOT launched into space from Plesetsk, Russia a rocket, built by POLYOT, that contained an Iranian earth satellite equipped with a camera.   Modanlo, FAI, FACS, NYSI, Malmirian, Heidari, Modares, Mehrdad and Naseri did not apply for or receive the required licenses or authorizations from OFAC to export or broker services to Iran and the Government of Iran.

The indictment goes on to further describe the efforts of Modanlo, Heidari, Modares, Mehrdad and others to conceal the Iranian identity of the beneficial owners of Prospect Telecom during complex and intertwined bankruptcy proceedings. FAI, as noted above, was placed in bankruptcy in 2001, and its proceedings remained pending at all times relevant to this case.  In July 2005, Modanlo was questioned about the $10 million NYSI had received during his testimony in a civil lawsuit in the Circuit Court for Montgomery County.  Modanlo declined to identify the source of the funds as Prospect Telecom.  On or about July 22, 2005, Modanlo filed an individual Chapter 11 bankruptcy petition, and was later questioned at proceedings under Section 341 of the Bankruptcy Code.   On or about October 14, 2005, Prospect Telecom commenced a replevin action in the Montgomery County District Court, seeking possession of NYSI's stock in FACS. Modanlo did not disclose the replevin action to creditors in his bankruptcy and took no steps to defend the replevin action, leading to a state court order directing NYSI to turn over its FACS stock to Prospect Telecom.  Modanlo turned over the stock

certificates to Prospect Telecom on or about November 9, 2005.  Disturbed by Modanlo's
conduct, the Bankruptcy Court, after extensive hearings, appointed a Trustee to administer
Modanlo's bankruptcy estate.

Once appointed, the Trustee placed NYSI into bankruptcy, requested information about
Prospect Telecom and its foreign bank account, and demanded and received information from
attorneys representing Prospect Telecom.  On or about December 22, 2006, the Trustee filed
complaints in the Modanlo and NYSI bankruptcy cases against Prospect Telecom ("the Prospect
Telecom adversary proceedings") seeking to recover the FACS stock certificates that Modanlo
had handed over to Prospect Telecom, without contest, in the Montgomery County replevin
proceedings.  On or about July 10, 2007, as part of the Modanlo and NYSI bankruptcy cases and
the Prospect Telecom adversary proceedings, Prospect Telecom, through counsel, submitted
answers to the Trustee's interrogatories.  Prospect Telecom stated that it did not have any
employees or agents; that its shareholders were Urs Hausheer and Sarl Morrisson; that Hausheer
was its sole director; and that "[t]he beneficial owners of Prospect Telecom AG are Reza
Heydarj; Abdul Reza Mehrdad; and Mohammad Modares, all of Paris, France."  It further stated
that "Prospect Telecom AG was organized specifically to invest in satellite and
telecommunications furnished by NYSI.  It has no former or current customers or clients or other
business"; and that "[p]rivate investors contributed funds to Prospect Telecom AG for purposes
of making the loan to NYSI"; and that "Prospect Telecom AG has made only one loan...."

On or about October 15, 2007, as part of the Modanlo and NYSI bankruptcy cases and the
Prospect Telecom adversary proceedings, Prospect Telecom, through counsel, submitted
supplemental answers to the Trustee's interrogatories.  Prospect Telecom stated that it "opened

its sole bank account at Credit Lyonnais (Suisse) S.A., Geneva"; that "[t]he beneficial owners of Prospect Telecom provided the funds to open Prospect Telecom's bank account, which funds were transferred to Prospect Telecom on or about June 6, 2002"; and that the sources of the funds that Prospect Telecom transferred to NYSI were "[t]he beneficial owners of Prospect Telecom AG, Reza Heydarj; Abdul Reza Mehrdad; and Mohammad Modares."

During the bankruptcy proceedings, Modanlo made a variety of false statements about the formation of Prospect Telecom, all intended to disguise materials facts about the formation of the front company in Switzerland.

### 2. The Pertinent Facts From Swiss Documents and Prior Interviews of the Swiss Witnesses

In response to a Mutual Legal Assistance Treaty Request made by the United States to Swiss authorities on January 25, 2006 ("the 2006 MLAT Request"), Swiss authorities produced documents, including documents from the law firm of Hausheer and Partner, and conducted formal interviews pursuant to Swiss law of Urs Hausheer, Arthur Schilter and Mehdi Zahedi. The interviews were conducted under penalty of perjury under Swiss law, on October 22 and October 23, 2009, with a U.S. prosecutor and investigating agents present,. Pertinent facts discussed below are derived from the Swiss interviews and documents, many of which were not received and/or translated until after the interviews were conducted, and demonstrate that the Swiss witnesses are critical to the presentation of the government's case.

Between December 2001 and April 2002, Modanlo and certain Iranians traveled to Switzerland to visit Hausheer and Partner. They met at the law firm to form Prospect Telecom to conceal the Iranians' involvement with Modanlo. Hausheer was chosen to assist in the formation

of the front company because he had a previous relationship with Nasseri, the former Iranian

Ambassador to Switzerland.  Shortly thereafter, Hausheer formed Prospect Telecom with 1000

shares of stock.  Hausheer took ownership of 9998 shares and two of his employees, including

Arthur Schilter, each took one share.  The beneficial owners of Prospect Telecom were Heidari,

Modares and Mehrdad.  Shortly after the formation of the Swiss company, the shares – and

ownership – were transferred to Saul Morrison.  Reza Heidari provided a Power of Attorney to

act for the French company.

In June 2002, approximately $10 million was wired into the Swiss Prospect Telecom

bank account and then wired out of that account in Switzerland to NYSI in the United States.

Once the loan was wired to NYSI, Modanlo moved large sums of the money into accounts for

FACS and, in one case, moved the money from the NYSI account to the FACS account and then

back to the NYSI account.  He also purchased a $500,000 annuity and made at least two

payments totaling approximately $800,000 to two Russian bank accounts in the name of the

Russian company POLYOT.

Approximately six meetings involving Modanlo and co-conspirators took place at the

Hausheer law firm and elsewhere between December 10, 2001 and March 11, 2006.  Memoranda

regarding these meetings were produced pursuant to the 2006 MLAT Request, have been

provided to the defense in discovery, and are attached hereto as Exhibits 1-4.[1]

The first three meetings occurred in December 2001, March 2002 and April 2002 and

were memorialized in one document.  *See* Exhibit 1.  The meetings included discussions about

---

[1]     The memoranda of the meetings at the Hausheer law firm were provided to the
U.S. Government in original German, and were translated by certified court translator.  Only the
English translations are provided here.

the beneficial owners of Prospect Telecom, the basis and reasons for forming the Swiss

company, the Prospect Telecom-NYSI loan agreement, and the Iranian Trade Embargo.

Evidence about these meetings is critical to establishing Modanlo's presence, his conduct and his

intent to violate the Embargo.  The memoranda composed by Schilter and Hausheer

memorializing these meetings are not admissible at trial, at least in the absence of the witness's

testimony.

The first meeting – in December 2001 – included Schilter as well as Nasseri, Heidari and

Malmirian.  The memorandum excerpt of that meeting, prepared by Schilter, describes how

Malmirian held himself out as a representative of an Iranian airline company, and how "they" had

an interest in investing in "New York Satellite Inc."  Since "the United States had issued

sanctions against Iran, this investment [would be] problematic."  To get around this, "they had

the idea" that "a Swiss company could act as an intermediate company to be able to make the

investments."  *See* Exhibit 1, ¶ 1.

In the second meeting – in March 2002 – involved Schilter, Modanlo and Nasseri.

Attorney Hausheer may also have had conversations or been present during these first two

meetings.  The memorandum of this meeting indicates that the three discussed the "procedure for

establishing a Swiss company" and that Modanlo had indicated that "in light of the [Iranian]

sanctions" a U.S. company whose majority shareholders were Iranian would be "problematic."

*See* Exhibit 1, ¶ 2.

The third meeting – in April 2002 -- involved Hausheer, Modanlo, Heidari, Modares and

Nasseri.  This meeting involved discussion of many of the logistics of forming the Swiss

company, which they decided to name Prospect Telecom, the shares of which were to be held by

9

"an employee of the Hausheer law firm" and "transferred to the French company later."  Heidari

also indicated he would have the other beneficial owners of Prospect Telecom sign the

appropriate forms.  During this meeting, Modanlo also presented a confidentiality agreement and

a draft loan agreement.  *See* Exhibit 1, ¶ 3.

Sometime after the April 2002 meeting, Modanlo and others, including Nasseri and

Heidari, met with Mehdi Zahedi, a financial consultant in Geneva, Switzerland for Credit

Agricole.  Hausheer and Schilter were not present and the meetings were not memorialized.

Zahedi stated in his 2009 interview that Naseri had previously known Zahedi and had made the

initial contact with Zahedi to inform him of the other coconspirators' interest in opening the

Prospect Telecom account.  During the meetings with Zahedi, the conspirators discussed the

purpose for forming Prospect Telecom and funded the opening of the account with money from

Iran.  In at least one of the meetings between Zahedi and the beneficial owners of Prospect

Telecom, Heidari brought Modanlo with him to meet Zahedi and discuss investment with

Modanlo's company.

Subsequent to the meetings with Zahedi to open a Prospect Telecom bank account,

memoranda indicate that Hausheer met with Modares and Heidari in Berlin in 2004 and met with

them and others in Moscow in 2005 and 2006.  The meetings concerned, among other things,

Modanlo and Prospect Telecom.  *See* Exhibits 2-4.

On July 15, 2004, Hausheer met with Heidari and Modares in Berlin.  During this

meeting, Heidari, among other things, confirmed that "he met [] Modanlo through [] Nasseri."

He also stated that Modanlo had "assured them he could help them obtain licenses for satellite-

aided communication in Arab countries" but had not succeeded "in procuring licenses [directly]

in the Arab countries ... [so] then tried to get the licenses through Turkey."  *See* Exhibit 2.

Heidari further stated that Modanlo had "regularly tried to reassure them [directly]" but that

Modanlo, Modares and Heidari now had"hardly ... any contact" except through Modanlo's family

in Iran, with whom Heidari and Modares were in "constant contact."  Heidari also said that,

while he wanted Hausheer to "apply some pressure" to get some requested documents, Heidari

also wanted "to respect the wishes of Mr. Modanlo to not disclose the relationship with Iran."

Heidari further explained how he and Modares had made payments "in local currency" to the

Chinese company that appeared in the paperwork to have partially funded the loan through

Prospect Telecom to NYSI.  The Chinese company then turned around and "made the payment to

Prospect Telecom for them [Heidari and Modares]."  *See* Exhibit 2.

In August 2005, Heidari and Modares introduced Hausheer to Mohamad Ali Voidan, an

Iranian lawyer, who Heidari "hired to protect his interests in connection with the [replevin] claim

against Nader Modanlo and [NYSI]."  Among other things, the parties to the meeting discussed

the reasons for Modanlo's filing for Chapter 11 bankruptcy protection in the United States.

Hausheer noted in his notes that the situation was critical for Prospect Telecom, because Prospect

Telecom had Iranian shareholders.  During this meeting, Heidari and Modares pointed out that

Prospect Telecom was still in Iranian hands, but that they had agreed "a while ago" to transfer the

shares to "someone outside of Iran."   The discussion also referenced conversations between

Modanlo and Heidari in which Modanlo "assured Heidari that he would do everything he could

to repay the loan [made to NYSI by Prospect Telecom]."  *See* Exhibit 3.

During the meeting in March 2006,[2] Heidari and Modares discussed Modanlo's assistance to Prospect Telecom, including securing telecommunication licences in Turkey and the Middle East, and further discussed the sensitivity of publicizing the names of the beneficial owners of Prospect Telecom, "particularly in the [then-existing] political situation in which Iran is being attacked, especially by the United States ..." Voidan and Heidari believed "that their names should not be made public ..." and that an affidavit could be provided from "the sole member of the Supervisory Board of Prospect Telecom" indicating that he knew the beneficial owners and that they were "in no way involved with Mr.. Modanlo financially." Heidari further stated that it "could be advantageous to sell Prospect Telecom retroactively to a trustworthy person in the Middle East who does not reside in Iran."

In sum, the memoranda make it abundantly clear who the principals were in the formation of Prospect Telecom, the extent of the conspiracy – including the range of unindicted co-conspirators – and how it was established to circumvent the Iranian Trade Embargo. The testimony of individuals present during the meetings, particularly as to statements of co-conspirators, are critical components of the government's proof. The testimony will also help establish the obstructive nature of Modanlo's responses during the bankruptcy proceedings.

### 3.    Unavailability of the Swiss Witnesses

Swiss nationals in Switzerland are not amenable to service of United States process, either by statute or treaty. *United States v. Germann,* 370 F.2d 1019, 1022–23 (2d Cir.), *vacated on other grounds,* 389 U.S. 329 (1967). The government has made repeated efforts to seek the

---

[2]    One memorandum summarizes a two-day meeting held on March 10 and March 11, 2006.

voluntary cooperation of Hausheer, Schilter and Zahedi to attend trial in the United States.

Requests for the three witnesses made pursuant to the MLAT were forwarded to the Swiss

prosecutor on several occasions.  *See, e.g.,* Exhibit 5(redacted), dated August 9, 2011 and Exhibit

6, dated February 7, 2012, attached hereto.  On at least one occasion, the defendant through his

counsel separately contacted at least one of the three witnesses, Arthur Schilter, and provided

him with a copy of a letter the defense team had forwarded to the Swiss prosecutor.  In that

presentation, the defendant informed the Swiss prosecutor – and Schilter – that "these Swiss

individuals have been accused of criminal wrong-doing by the United States, and as such, are

exposed to prosecution by the United States Government."  *See* Exhibit 7, Defense Letter dated

April 3, 2012, attached hereto.  Shortly after the letter was sent, the Swiss prosecutor informed

the Office of International Affairs at the Department of Justice that Zahedi agreed to a deposition

in Switzerland, but that both Schilter and Hausheer refused to further cooperate.  *See* Exhibit 8,

e-mail from Swiss prosecutor Raphael Mauro to Glenn Stewart, Office of International Affairs,

Department of Justice, dated May 22, 2012, attached hereto.  Only after the Swiss prosecutor

took the heretofore unprecedented step of compelling the deposition testimony have Hausheer

and Schilter acquiesced in depositions to be taken in Switzerland.  *See* Exhibit 9, Letter from

Julia Meier of the Swiss Federal Office of Justice, dated December 3, 2012, attached hereto.

For the Court's reference, the Swiss prosecutor, prior to the 2009 interviews of the Swiss

witnesses, requested that the U.S. prosecutors provide assurances that the Swiss witnesses would

not be prosecuted in connection with the allegations in the charges against Modanlo.  The

assurances were provided in advance of the interviews and again after defendant sent his April 3,

2012 letter to the Swiss prosecutor and to Schilter.  *See* redacted Exhibits 10, Letter dated May

22, 2009 and Exhibit 11, Letter dated September 24, 2012, attached hereto.

## ARGUMENT

Fed. R. Crim. P. 15(a) provides in pertinent part that "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial.  The court may grant the motion because of exceptional circumstances and in the interest of justice.... "   Any such deposition may be used by any party, as provided by the Federal Rules of Evidence.  Fed. R. Crim. P. 15(f).

1.     **The Governing Standards**

The Fourth Circuit has not directly addressed the "exceptional circumstances" standard in detail, but the few Fourth Circuit cases relying on Rule 15 are consistent with reading "exceptional circumstances" as requiring the moving party to establish "at least that the witness will likely be unavailable to testify at trial and that the witness's testimony is material." *United States v. Jefferson,* 594 F.Supp. 2d 655, 664 (E.D. Va. 2009); *United States v. Hajbeh,* 284 F.Supp.2d 380, 384 (E.D.Va.2003).  *See United States v. McHan,* 101 F.3d 1027, 1037 (4th Cir.1996) (noting that "[w]hen the government knows that a witness will be unavailable, it has the choice of seeking to preserve the witness's testimony under Federal Rule of Criminal Procedure 15, or relying at its own risk on its ability to introduce hearsay (such as the witness's grand jury testimony), or losing the benefit of the witness's testimony altogether"); *United States v. Rivera,* 859 F.2d 1204, 1207 (4th Cir.1988) (upholding district court order allowing illegal alien material witnesses to be deposed and released from custody).

With respect to governing Fourth Circuit case law, Judge Ellis of the Eastern District of Virginia has observed:

The few Fourth Circuit cases relying on Rule 15 are consistent with reading "exceptional circumstances" as requiring the moving party to establish at least that the witness will likely be unavailable to testify at trial and that the witness's testimony is material. *See United States v. McHan,* 101 F.3d 1027, 1037 (4th Cir. 1996) (noting that "[w]hen the government knows that a witness will be unavailable, it has the choice of seeking to preserve the witness's testimony under Federal Rule of Criminal Procedure 15, or relying at its own risk on its ability to introduce hearsay (such as the witness's grand jury testimony), or losing the benefit of the witness's testimony altogether"); *United States v. Rivera,* 859 F.2d 1204, 1207 (4th Cir. 1988) (upholding district court order allowing illegal alien material witnesses to be deposed and released from custody). Further, while the district court in *United States v. Moussaoui,* 382 F.3d 453 (4th Cir.2004), had ordered the government to produce three enemy combatant witnesses for Rule 15 depositions, the Fourth Circuit analyzed and upheld that aspect of the district court's action under the lens of the Sixth Amendment because the witnesses were in the government's custody.

*Jefferson*, 594 F.Supp.2d at 664 n.9.   These cases are consistent with the case law from other courts of appeals.   *See generally United States v. Liner*, 435 F.3d 920, 924 (8th Cir.2006) ("To establish exceptional circumstances, the moving party must show the witness's unavailability and the materiality of the witness's testimony."); *United States v. Kelley,* 36 F.3d 1118, 1125 (D.C. Cir. 1994) ("Critical factors ... include (1) the materiality of the testimony; and (2) the unavailability of the witness to testify at trial."); *United States v. Ismaili,* 828 F.2d 153, 159 (3d Cir.1987)("... when the district court exercises its discretion in ruling on a Rule 15(a) motion, considerations of materiality (of the testimony) and unavailability (of the witnesses) remain critical.")  In the case of proposed foreign depositions, "the district court must consider, among other factors, whether the deponent would be available at the proposed location for deposition and would be willing to testify..... The court should also consider whether the safety of United States officials would be compromised by going to the foreign location...."  *United States v.*

15

*Olafson*, 203 F.3d 560, 567 (9th Cir. 2000)(internal citations omitted).[3]

As a threshold procedural matter, to establish that witnesses are unavailable to testify in

the United States, it is not necessary for them to personally execute affidavits.  To quote again

from Judge Ellis's opinion in *Jefferson*:

> Although an affidavit from the proposed deponent represents the most reliable
> way to establish that individual's probable unavailability, affidavits are not the
> only means available to show that a substantial likelihood exists that the proposed
> deponent will not testify at trial. *See United States v. Des Marteau,* 162 F.R.D.
> 364, 369 (M.D. Fla.1995) ("[Rule] 15 does not explicitly require supporting
> affidavits, and representations made by counsel in open court have been held
> sufficient to establish probable unavailability.") ... Accordingly, courts must
> assess the unavailability of a potential witness by carefully examining all the
> reasonably reliable available information and then making a reasoned judgment as
> to a person's unavailability.

*Jefferson,* 594 F.Supp. 2d at 665-66.

On the merits, the Swiss witnesses are clearly unavailable.  In *United States v. Rivera,*

859 F.2d 1204, 1207 (4th Cir. 1988), a prosecution for the illegal transport of illegal aliens, the

Fourth Circuit affirmed the admission of depositions taken of illegal aliens who worked for the

defendants.  The defendant and his attorney were present at each deposition and participated

through cross-examination and also by the attorney making certain comments into the record as

to the demeanor and condition of the witness.  After the depositions were taken the deposed

aliens elected to voluntarily return to Mexico rather than face deportation proceedings.  *Id.* at

1205-06.  The Court of Appeals found that the witnesses were unavailable for trial because "[i]f

they were released from custody, they had no place to stay, and there was no way to ensure that

---

[3]     Depositions in Switzerland would not present any safety issues.  While no final
arrangements have been made, the most likely location is at the offices of the Swiss Central
Authority in Bern.

they would be present at trial two months later." *Id.* at 1207.  The court further found that the

depositions satisfied constitutional standards because the defendant and his attorney were present

at the depositions and counsel cross-examined the witnesses and made his personal observations

of the witnesses a part of the record.  *Id.* at 1208.  In sum, the "the trial-type setting of the

depositions produced sufficient 'indicia of reliability' to satisfy the Sixth Amendment." *Id.* at

1209.

*United States v. Johnpoll,* 739 F.2d 702, 708 (2d Cir. 1984), specifically endorsed taking

Rule 15 depositions of witnesses in Switzerland.  The defendant, who was charged with

conspiracy and substantive offenses related to the transport of stolen securities, had discussed the

stolen securities with four key Swiss financial personnel and attorneys in Switzerland, had

traveled to Switzerland to collect from Swiss witnesses the proceeds of sales of the securities,

and had instructed Swiss witnesses how to transfer the proceeds of the securities sales from

Switzerland to the defendant's U.S. bank accounts.  739 F.2d at 704.  The Swiss witnesses

originally agreed to testify in the United States but demanded compensation for time away from

work and other expenses that exceeded what American prosecutors could lawfully pay.  The

district court approved taking depositions in Switzerland.  On appeal, the Second Circuit found

that the witnesses were unavailable for trial within the meaning of Rule 15 and that the

witnesses' testimony was material.  "In the first place, being Swiss nationals in Switzerland, they

were not amenable to service of United States process, either by statute or treaty....  The

government [also] asked the witnesses to appear voluntarily and toward that end offered to pay

their travel expenses, as authorized by federal law," but the witnesses made numerous demands

for additional compensation.  *Id.* at 709 (citation omitted).  The Second Circuit found the

government's refusal to accede to their demands to be reasonable. "It is readily apparent that in the absence of extraordinary circumstances (not present here), even assuming the government had funds to meet the witnesses' demands, its submission to these conditions would establish a precedent that could have extensive harmful repercussions. If it were required to yield to such demands before being permitted to avail itself of Rule 15, it might then be forced in the future to submit to potentially unlimited pressure from foreign witnesses (requesting much higher levels of compensation), which might justify criticism that their testimony was being 'bought.'" *Id.* On the issue of materiality, the court found that the testimony of the Swiss witnesses was clearly material since they had "dealt extensively with the defendant in his making of arrangements for transporting the stolen securities and secreting the proceeds from their sale. Indeed, it is unlikely that Johnpoll could have been convicted without their testimony." *Id*. at 709.

Finally, the Second Circuit found no flaw with the deposition procedures. The Swiss magistrates in charge of the scheduled depositions originally required that all questions would have to be submitted in advance, but later agreed to full cross-examination. The U.S. prosecutor made arrangements to permit a telephone hook-up so that the defendant, who refused to attend the depositions, could listen to them. U.S. defense counsel did not attend the depositions, indicating instead that Swiss attorneys would raise objections to the proceedings on behalf of the defendant. The government then deposed the four key Swiss witnesses, as well as a police officer whose deposition had been unscheduled. The defendant did not listen to the depositions through a telephone hook-up, and both of his Swiss attorneys declined to participate in the depositions other than to state their opposition to the proceedings. Neither attorney cross-examined the deponents. When the Assistant U.S. Attorney returned to the United States

with the depositions, the district court judge examined them, heard defense objections, excised those portions that were prejudicial or irrelevant, and determined that the rest  of the deposition testimony was admissible.  The Second Circuit concluded that the Confrontation Clause did not preclude admission of prior testimony of an unavailable witness, provided his unavailability is shown and the defendant *had an opportunity* to cross-examine.  *Johnpoll*, 739 F.2d at 710.

Similarly, in *United States v. Sturman*, 951 F.2d 1466, 1480-81(6th Cir. 1991),  a tax evasion prosecution, the depositions of four Swiss bank officials were taken in Switzerland prior to trial. These depositions were presided over by a Swiss magistrate, who had aided the United States in the investigation and prosecution of the defendants.  During the depositions, the Swiss magistrate instructed the defendants to register any objections to the proceeding in writing. He disallowed verbatim transcription. Instead, the Swiss magistrate dictated a summary of each question and response and noted objections either contemporaneously or required them to be submitted later in writing. Witnesses were given the opportunity to read the summaries and then sign them. During the trial in this case, the English translation of a portion of these depositions was read into the record.  The Sixth Circuit concluded that "[d]epositions taken in foreign countries cannot at all times completely emulate the United States' method of obtaining testimony."  *Id.* at 1481.  Nevertheless, "all steps were taken to ensure the defendants' rights while respecting the legal rules established in a different country, [including] [c]ross-examination, acceptance and consideration of objections, and the review of all written testimony by the witnesses to ensure[] that the testimony complied with Rule 15(d) to the extent possible." *Id.* at 1480-81.  Although the witnesses were not given an oath, each witness was told the penalties for giving false testimony.  The Sixth Circuit recognized that an oath may not be given

in some foreign countries and that the omission of such an oath does not automatically result in the suppression of the deposition. *Id.* at 1481; *United States v. Casamento,* 887 F.2d 1141, 1172–75 (2d Cir.1989).

In addition to the cases involving Swiss depositions, courts have approved depositions of foreign witnesses in a variety of other cases. *United States v. Abu Ali,* 528 F.3d 210, 238-43 (4th Cir. 2008), a terrorism prosecution, approved depositions of defendant's Saudi interrogators even thought the defendant was absent due to his imprisonment. The Rule 15 deposition "was the result of the logistical arrangements the trial court made to deal with the practical difficulties of securing testimony from [Saudi officers]"). *United States v. McKeeve,* 131 F.3d 1, 7-9 (1st Cir. 1997), an IEEPA prosecution, approved the deposition in Great Britain of a British shipping agent. The Rule 15 transcript was deemed admissible at trial even though British authorities did not permit videotape or audiotape of proceedings, and even though the defendant was not present. The defense counsel was permitted to attend and communicate with the defendant in a U.S. jail through a telephone line hooked up specifically for the deposition. Deposition procedures do not have to precisely match American standards. Another Second Circuit case stated that a foreign deposition would be admissible, "unless the manner of examination required by the law of the host nation is so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable...." *United States v. Salim,* 855 F.2d 944, 953 (2d Cir. 1988)(deposition of drug courier prosecution witness in France using French procedures not in violation of Rule 15, even though defendant not present at deposition because he was in U.S. custody and even though deposition conducted by French magistrate on written questions submitted by both parties). Simply stated, "substantial

compliance" with Federal Rule of Criminal Procedure 15 was all that was required. *Sturman*,
951 F.2d at 1481. *See also United States v. Gifford*, 892 F.2d 263, 264-65 (3d Cir.
1989)(videotaped depositions of Belgian witnesses taken at U.S. Embassy in Belgium held
admissible despite absence of defendant, where defendant's attorney was physically present and
where defendant was able to both hear witnesses and consult with attorney during depositions by
means of telephone hook-up).

Ultimately, the paramount goal of utilizing Rule 15 depositions is to avoid injustice
where foreign witnesses are alive and capable of testifying but cannot be subjected to direct
United States process.  In *United States v. Drogoul,* 1 F.3d 1546, 1551-57 (11th Cir. 1993), the
First Circuit reversed the district court's denial of the government's  motion to take a total of 13
depositions of Italian bank officials in a case pertaining to charges of wire fraud involving the
U.S. manager of the Italian bank, despite the fact that the Italian magistrate had sent the U.S.
prosecutor a letter indicating that the witnesses were unavailable and even though the
government claimed the testimony was highly relevant to the central fact of whether the U.S.
bank official was authorized to make loans to Iraq that were at the heart of the charges against
him.  The First Circuit concluded that exceptional circumstances warranted depositions because
the witnesses were unavailable for trial, their testimony was material, and the absence of their
testimony would result in an injustice.  1 F.3d at 1552.  When a prospective witness is unlikely to
appear at trial and his or her testimony is critical to the case, "simple fairness requires permitting
the moving party to preserve that testimony-by deposing the witness-absent significant
countervailing factors which would render the taking of the deposition unjust." *Id*. at 1552.  The
Fourth Circuit endorsed this principle in *Abu Ali,* holding that "[i]f the government is flatly

21

prohibited from deposing foreign officials anywhere but in the United States, this would jeopardize the government's ability to prosecute [criminals] using the domestic criminal justice system." 528 F.3d at 241.

**2.      The Swiss Witnesses Are Unavailable to Testify in the United States, Their Testimony Is Material, and Depositions Would Prevent an Injustice**

As indicated above, the government's repeated efforts to have the Swiss witnesses appear at trial in the United States did not meet with success.  After numerous requests to Switzerland, and communications by the defendant with at least one of the Swiss witnesses, Hausheer and Schilter refused to be deposed at all, and Zahedi indicated his willingness to be deposed in Switzerland.  Only after the Swiss prosecutor sought to compel their testimony did Hausheer and Schilter allow the appeal period to lapse and thus acquiesce in submitting to depositions in Switzerland.

Applying these principles, the Swiss witnesses are clearly unavailable, their testimony is unquestionably material, and failure to take their depositions would result in an injustice.  As indicated above, Hausheer, Schilter and Zahedi were present during various stages of the process of forming Prospect Telecom and were present during significant discussions by the co-conspirators and Modanlo as to the process of, and reasons for, the formation of Prospect Telecom, the knowledge of the beneficial owners' nationalities, and the scope of the agreement between Modanlo and Prospect Telecom.  The testimony of the Swiss witnesses is clearly material since they had dealt extensively with Modanlo, the beneficial owners of Prospect Telecom and other co-conspirators in the formation of Prospect Telecom and the transfer of the $10 million into the Prospect Telecom account.  Indeed, just as the Second Circuit noted in

*Johnpoll*, it is unlikely that the Government could meet its burden of proof without their testimony.   739 F.2d at 709.

The testimony of the Swiss witnesses, as it relates to the documents provided by the Swiss government and to the information made available during their formal 2009 interviews, cuts to the heart of the case against Modanlo, inasmuch as it relates to the conduct and cover up of the Defendant's violation of the Iranian Trade Embargo, and his concealment of material facts about Prospect Telecom from the bankruptcy court.  The testimony is one of the principal means of establishing Modanlo's relationship with the beneficial owners and other co-conspirators and addresses elements of the charges related to the violation of the Iran Trade Embargo and the obstruction of bankruptcy proceedings.  For that reason, preservation of their testimony is also in the interests of justice.

Moreover, deposition testimony does not violate Modanlo's confrontation rights.  The Confrontation Clause does not preclude admission of prior testimony of an unavailable witness, *Mattox v. United States,* 156 U.S. 237 (1895), provided his unavailability is shown and the defendant had an opportunity to cross-examine.  *Ohio v. Roberts,* 448 U.S. 56, 73 (1980); *Mancusi v. Stubbs,* 408 U.S. 204, 216 (1972); *California v. Green,* 399 U.S. 149, 165–66 (1970. In the instant case, Modanlo has a full opportunity, with his attorney, to confront and cross-examine the Swiss witnesses.  Accordingly, there would be no violation of Modanlo's Sixth Amendment rights in admitting foreign deposition testimony.

Accordingly, a request for depositions in this case is reasonable and based on exceptional circumstances that such witnesses are unavailable to testify at trial.  The defendant will be provided with the location of the depositions as soon as they are arranged, but it is anticipated

that those depositions will take place at a location in Bern, Switzerland in or about February

2013.

       **WHEREFORE** the Government respectfully requests that this Court approve the

Government's request to take depositions of Urs Hausheer, Arthur Schilter and Mehdi Zahedi.

                Respectfully submitted,

                Rod J. Rosenstein
                United States Attorney


By:  _____/s/_____
                David I. Salem
                Stuart A. Berman
                Assistant United States Attorneys
                400 U.S. Courthouse
                6500 Cherrywood Lane
                Greenbelt, Maryland 20770-1249
                301-344-4237

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. PJM-10-0295** |
| | * | |
| **NADER MODANLO,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## ORDER TO CONDUCT PRE-TRIAL DEPOSITIONS

Having considered the Motion of the United States and there being good cause shown, it is this _____ day of _____ 2012,

**HEREBY ORDERED** that the United States has established exceptional circumstances for the taking of pre-trial depositions of Urs Hausheer, Arthur Schilter and Mehdi Zahedi, because such witnesses are otherwise unavailable to testify at trial in the United States, and that it is in the interests of justice to preserve such testimony prior to trial; and it is

**FURTHER ORDERED** that such depositions be scheduled at a mutually-convenient location and time prior to trial on April 9, 2013; and it is

**FURTHER ORDERED** that the United States provide defense counsel one week in advance of said depositions any statements of the deponents in the government's possession to which the defendant would be entitled at trial; and it is

**FURTHER ORDERED** that, to the extent practicable, such depositions be videotaped to

preserve further argument as to their admissibility at trial.


_____
Peter J. Messitte
United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 3rd day of December 2012, a copy of the foregoing government's

Opposition Motion was filed ECF, with copies to:

**Lucius Outlaw**, **Esq.**
Assistant Federal Public Defender
Tower II, 9th Floor
100 South Charles Street
Baltimore, Maryland 21201-2705


_____/s/_____
David I. Salem

3