**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PJM-10-0295** |
| | * | |
| **NADER MODANLO,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ****** | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF ADMISSION OF
DOCUMENTS SEIZED FROM RESIDENCE OF YAKOV SEGEL**

The United States, by and through undersigned counsel, submits this memorandum in support of the admission in evidence of the remaining disputed documents seized from the residence of Yakov Segel, an employee of defendant Nader Modanlo.

**FACTUAL BACKGROUND**

On December 8, 2003, federal agents executed a search warrant at the Owings Mills, Maryland residence of Yakov Segel. Documents introduced to date during the trial indicate that Segel traveled frequently with defendant Modanlo and was present at important meetings leading up to the Russian-Iranian-Modanlo arrangement that has given rise to this case. *See* **SW-FAI 28-34**. Segel worked at Final Analysis, Inc. and/or Final Analysis Communications Services, Inc. for many years and, according to one document from 2002 – the year during which the most important transactions in the charged conspiracy took place – was "CIS Program Manager." *See* GX SW-FAI 52 at 1, 3.[1] Testimony from Mark Cascia, Mary Kay Williams, Tatiana Lawrence, Elizabeth McLean and other witnesses described Segel's role as

---

[1]      In this context, "CIS" presumably refers to Commonwealth of Independent States, an entity that comprised nations of the former Soviet Union.

one of the translators who accompanied defendant Modanlo (who did not speak Russian) to meetings with officials of the Russian rocket booster entity POLYOT (whose English ranged from rudimentary to non-existent), including Vasily Gorlov, POLYOT's deputy chief designer and FAISAT program manager.  These matters included a meeting at the Golden Ring hotel in Moscow, Russia in June 2001.   Segel attended for FAI/FACS, along with Modanlo and another employee, Ali Aladpoush.  Gorlov attended for POLYOT, along with the general director, Oleg Dorofeev, and Dorofeev's advisor, Vitaly Shetenin.  Also in attendance was a third group – described by Lawrence in her testimony as Middle Eastern persons who did not introduce themselves, were not introduced by Modanlo, spoke to Modanlo in a language that was neither Russian nor English, and discussed matters relating to satellites that were different from the telecommunications satellite constellation that was the mainstream of other discussions between Modanlo's company and POLYOT officials.

During the search of Segel's home office, agents located a briefcase which contained a folder marked "Nader."  The folder itself has been admitted as **SW SEGEL 16.**  Inside the folder were three documents containing defendant Modanlo's handwriting which have been admitted in evidence (**SW SEGEL 4, 8** and **9**) as well as the following additional documents, which are attached as exhibits and are set forth in chronological order:

> **SW SEGEL 1**:   A November 28, 2000 fax from POLYOT, with the fax heading "DB 'POLYOT' Gorlov Omsk."  The telephone number listed in the fax, 3812 539200, is the same number listed for Gorlov in defendant Modanlo's address book**, SW FAI 4**.  The fax retransmits a letter that written in English to Gorlov, apparently on

November 23, 2000, by M. Modiri of the Islamic Republic of Iran, Institute of Survey Engineering.  The letter requests that Gorlov "arrange a visit from the satellite and lunch [sic] production facilities" for six named visitors, including one of Modanlo's employees, Ali Aladpoosh, as well as Hamid Malmirian, an Iranian who later participated with Cyrus Nasseri and Reza Heidari at the December 10, 2001 initial meeting relating to Prospect Telecom at the Hausheer and Partner law firm in Zug, Switzerland.  *See* **MLAT HAUSHEER 6B.**  The letter further states that "all Passports are issued in Tehran."

**SW SEGEL 2/2A**:   (The English translation is **SW SEGEL 2A**, the Russian version is **SW SEGEL 2**.)  This document is a letter to Segel concerning activities of the Commission on Export Control and noting that "[i]f the decision of the Commonwealth is positive, it will be necessary to undergo the procedure for obtaining permission to hand over the materials to a <u>specific partner</u>."

**SW SEGEL 15/15A**: (The English translation is **SW SEGEL 15**, the Russian version is **SW SEGEL 15A**.)  The document is a December 10, 2001 letter from Aviaexport to "Vasiliy Ivanovich" – previously identified as Gorlov – concerning "talks with a foreign customer on a project that will provide for the development, manufacture and launch of a microsatellite to provide data transmission" and that "should you

3

[Gorlov] confirm your interest in the launch, we are ready to hold additional talks to define the conditions of the Polyot ... participation in the project." This letter is dated the same day as the initial Prospect Telecom-related meeting in Switzerland.

**SW SEGEL 5**:   This document is an April 9, 2002 fax from Gorlov of an April 8, 2002 letter in English from Rosoboronexport, a Russian entity with an office address in Moscow, to Malmirian. The letter thanks Malmirian for a previous fax and "confirm[s] the fact that Rosoboronexport and Polyot came to a decision on joint participation in the Project. In this regard we are doing preliminary steps to organize your delegation visit to Russia to hold technical discussions with Polyot, Opteks, and OKB MEI." Malmirian's address is provided as the "Institute of Survey Engineering, Islamic Republic of Iran." The document is copied to "Mr. Gorlov, PO POLYOT." The signature block of the letter reads, "V. Yarmolyuk, Deputy Head of Defence, Technologies & Space Department." The fax header again reads "DB 'POLYOT' Gorlov Omsk." The date of the meetings between the Russians and Iranians is shortly after the March 14, 2002 meeting in Zug involving Modanlo, Nasseri and one of the Swiss lawyers. *See* **MLAT HAUSHEER 6B.**

4

**SW SEGEL 14/14A**: (The English translation is **SW SEGEL 14**, the Russian version is **SW SEGEL 14A**.)  The document is faxed on April 8, 2002 from Gorlov's fax number.  The letter is dated the same day and is a letter from Rosoborneksport to the Chief Designer - Director, "Polyot" Design Bureau, in Omsk, with the salutation, "Dear Vasiliy Ivanovich," "ask[ing] about organizing a visit to Russia by a delegation of Iranian specialists" to conduct talks at some future date to discuss "issues related to the implementation of the SINA project."  The author also requests that a number of items be sent to him, including "preliminary presentation materials on the SINA project" and "anticipated expenses on the Iranian side."

**SW SEGEL 6**: This document is an April 17, 2002 fax from Gorlov of a letter dated the same day in English from Rosoboronexport to Malmirian informing him that the Russians "are going to host your delegation in Russia in the second half of May."  The letter also indicates that the Russians "propose about 10 days for the visit," asks Malmirian to "advise [the Russians] about the period of the visit," "confirm expenses," notes that an official invitation "will be forwarded to [Malmirian] after "approval of our authorities is received."  It further asks Malmirian to send "delegation members passport copies" and that a "prompt reply will be highly appreciated."  Again,  Malmirian's address is provided as the "Institute of Survey

Engineering, Islamic Republic of Iran."   The signature block of the letter reads, "B. Obnosov, Head of Department, Defense Technologies & Space," Rosoboronexport."  The fax header again reads "DB 'POLYOT' Gorlov Omsk."

**SW SEGEL 7**:        This document is a May 7, 2002 fax from Gorlov of a letter dated the same day in English from Rosoboronexport to H. Malmirian indicating that the necessary POLYOT approvals were granted and that his delegation "may arrive in Omsk on May 12, 2002.  The letter asks Malmirian to "inform" POLYOT of travel details" and to "provide" such information before the visit.  The signature block of the letter reads, "B. Obnosov, Head of Department, Defense Technologies & Space," Rosoboronexport."  The fax header again reads "DB 'POLYOT' Gorlov Omsk."  The letter indicates that it was cc'd to Gorlov.  This letter is dated shortly after the third meeting in Switzerland on April 26, 2002, which involved Modanlo, Nasseri, Reza Heidari, Mohammad Modares and two Swiss lawyers – *see* **MLAT HAUSHEER 6B** – as well as the creation of the Prospect Telecom bank account on April 29, 2002 and the initial deposit of funds into the account on May 1, 2002.

*See* **MLAT CREDIT AGRICOLE 2A, 3**.

**SW SEGEL 11**:      Undated "Appendix A - Price & Payment Schedule" in English referencing activity at "Contractor's site" and "Beneficiary's site."

6

**SW SEGEL 12:**  Undated "Appendix E - Schedule" in English referencing activity at "Contractor's site" and "Beneficiary's site."  The signature on the top of this page appears to be the same as Gorlov's signature, as it appears on documents such as the FAISAT 3v Contract (**SW FAI 8**).

**SW SEGEL 13:**  Undated "Appendix G - Figure-1" in English referencing "Pre-Launch & Shipment," "Launch," and "Early Orbit Operation."

The remainder of this memorandum addresses defendant's objections to these exhibits on the grounds of authenticity and hearsay.

## ARGUMENT

## I.  THE SEIZED EVIDENCE IS PROPERLY AUTHENTICATED

Fed. R. Evid. 901 governs authentication of evidence and provides in pertinent part:

(a)     In general.  To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the items is what the proponent claims it is.

(b)     Examples.  The following are examples only – not a complete list – of evidence that satisfied the requirement

(2)     Nonexpert Opinion About Handwriting.  A nonexpert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation.

*** 

(4)     Distinctive Characteristics and the Like.  The appearance, contents, substance, internal patterns, or other characteristics of the item. taken together with all the circumstances.

Rule 901(b)(4) governs the items contained in **SW SEGEL 16** that do not bear defendant's handwriting.  The Fourth Circuit has held that Rule 901 is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims."

To establish that evidence is authentic, the government need only make a *prima facie* showing, through circumstantial evidence, that the documents are what they purport to be. *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009); *United States v. Dumeisi*, 424 F.3d 566, 575 (7th Cir. 2005).  Authentication can be accomplished through testimony about the circumstances surrounding the evidence's seizure.  *See Burgess v. Premier Corp.*, 727 F.2d 826, 835 (9th Cir. 1984) (authentication of documents was satisfied where the sole means of authentication was the fact that they were found in defendant's warehouse); *United States v. Block*, 148 F. App'x 904, 911 (11th Cir. 2005) (seizing agent's testimony about the procedures used in searching and seizing documents satisfied the authenticity requirement because the testimony was "sufficient to support a finding that the documents in question are what the government claims – documents seized from [defendant's] desk during execution of the search warrant").  Sufficient circumstantial evidence exists even where "the Government could not trace the precise history of the documents prior to their seizure.  *Vidacak*, 553 F.3d at 350-51; s*ee also United States v. Demjanjuk*, 367 F.3d 623, 631-32 (6th Cir. 2004) (holding that foreign documents were sufficiently authenticated by supporting circumstantial evidence, even if their origin could not be proven).

This case presents authentication issues similar to those resolved in the government's favor in a number of similar cases involving evidence seized from locations

controlled by a defendant or a co-conspirator.  Generally, these cases hold that documents

are authentic where they are discovered in the possession of a coconspirator and where the

content makes reference to individuals involved in the conspiracy or facts that only a

limited number of people would know.  For example, in *United States v. Reyes*, 798 F.2d

380, 383 (10th Cir. 1986), notes seized from the defendant's known residence that

contained the name of defendant, initials of his coconspirators, and various notations of

phone numbers, ounces, and other numbers were sufficient to establish authenticity, based

on"[t]he source of the notes and the correspondence of information contained in the notes

to members of the conspiracy provided ample foundation for their admissibility.

Moreover, the contents of the notes indicated that they were written by someone involved

in the conspiracy."  *Id.* (citing *United States v. Drougas*, 748 F.2d 8, 26 (1st Cir. 1984).

Likewise, in *United States v. Baker*, 855 F.2d 1353, 1359 (8th Cir. 1989), items collected

from a co-conspirator's garbage were held properly admitted because all of the items came

from the same garbage bags at a coconspirator's residence and some of the items, such as

notes, bills, and receipts, contained distinctive characteristics that linked the items to the

coconspirators.

   The authentication of multiple documents seized from one location can involve

mutual reinforcement among the items.  *United States v. McGlory*, 968 F.2d 309, 329 (3d

Cir. 1992), sustained the authentication of notes seized during the execution of a search

warrant from the known residences of defendant.  Several of the documents were contained

in the same apparatus – a garbage bag – that also contained identifying information.  The

notes were similar in form, contained the initials of persons known to associate with

defendant, and were found outside the known residences of defendant.  *Id.*  Such

documents could be authenticated by their contents and "a document . . . may be shown to

have emanated from a particular person by virtue of its disclosing knowledge of facts

known particularly to him."  *Id.* at 330 (citing Fed. R. Evid. 901 advisory committee's

notes, example 4).  In *Drougas*, where notes that were found in defendant's apartment and

depicted the names of many coconspirators, authentication was affirmed where the "string

of coincidences" verifying authenticity included, among other things, "the circumstances

surrounding the[] seizure, the fact that the information corresponded to other evidence of

the participants in the conspiracy, and the extreme unlikelihood that such a list would be

prepared by one not in privity to the operation of the conspiracy."  748 F.2d at 26.

The documents in this case were all recovered from one file folder, marked

"Nader," which was found in the home office of one of the defendant's most trusted

employees and associates.  Testimony has established that Segel translated for Modanlo

important meetings with the Russians, and attended the June 2001 Moscow meeting

involving Modanlo, the Russians and a group of Middle Easterners who spoke to Modanlo

in a language other than Russian and English.  The folder included multiple items, already

admitted into evidence, which contained the defendant's handwriting.  The initial letter

from the Iranians to the Russians, **SW SEGEL 1**, includes the name of Ali Aladpoosh, an

FAI employee who worked directly for defendant Modanlo and also attended the Moscow

meeting.  **SW SEGEL 2** is written to "J. Segel" from Gorlov and refers to "obtaining

permission to hand over the materials to a <u>specific partner</u>."  The schedules, **SW SEGEL**

**11** through **13**, will eventually be linked to the SMALL-SAT agreement taken from Gorlov

in 2003 when he entered the United States.  Taking all of these facts together, the folder

and its contents are sufficiently authentic under Rule 901.

## II.       THE SEIZED EVIDENCE IS NOT HEARSAY

Defendant also objects on hearsay grounds to the admission of the remainder of the

documents contained in **SW SEGEL 16**.  As discussed below, many of the documents are

admissible as non-hearsay coconspirator statements; all are admissible as non-hearsay

because they may be offered to prove relationships among the conspirators; several are

non-hearsay inquiries; and several are admissible as non-hearsay implied assertions.

### A.       Viewed as Statements of Vasily Gorlov, All Documents Transmitted from Gorlov's Fax Number Are Admissible Pursuant to Fed. R. Evid. 801(d)(2)(E) As Statements by a Conspirator in Furtherance of a Conspiracy

**SW SEGEL 1, SW SEGEL 2, SW SEGEL 5, SW SEGEL 6, SW SEGEL 7** and

**SW SEGEL 14** were all faxed from Gorlov's personal telephone number and ended up in

the hands of defendant's trusted associate, Segel, in a file marked "Nader."  Gorlov's

communication of these documents to Modanlo's agent are admissible as nonhearsay

coconspirator statements in furtherance of the charged conspiracy.

Under Fed. R. Evid. 801(a), Gorlov's retransmission of the documents was its own

"statement," specifically a written assertion of documentary information relating to the

evolution of the Russian-Iranian satellite project.  Under Fed. R. Evid. 801(d)(2)(E), a

statement is not hearsay if it is offered against an opposing party and "was made by the

party's coconspirator during and in furtherance of the conspiracy."  As the Fourth Circuit

recently reiterated in *United States v. Graham*, 711 F.3d 445 (4th Cir. 2013), "[i]n  order to

admit a statement under 801(d)(2)(E), the moving party must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy." *Id*. at 453 (citing *United States v. Heater,* 63 F.3d 311, 324 (4th Cir.1995)).[2] "A statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *United States v. Shores,* 33 F.3d 438, 443 (4th Cir.1994). Examples of statements that further a conspiracy are those that seek to induce a co-conspirator's assistance, discuss the activities and progress of the conspiracy, identify the names of other co-conspirators, or explain events important to the conspiracy. The three prongs of admissibility for coconspirator statements – existence of a conspiracy, membership of defendant and declarant, and statements being made in the course of – must be supported by a preponderance of the evidence. *See Blevins,* 960 F.2d at 1255.

Directly on point is *United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000), which involved defendants who spied for the HVA, a foreign intelligence arm of the intelligence agency of the now-defunct German Democratic Republic, commonly known as East Germany. At trial, the government introduced certain HVA records, including "true name" cards showing the names and addresses of defendants and a coconspirator and documents listing some of their code names and the names of the operations to which they

---

[2]     The Fourth Circuit sometimes merges the three elements of coconspirator statements into two, requiring "there must be evidence (1) that there was a conspiracy between the declarant and the non-offering party; and (2) that the statement was made during the course and in furtherance of that conspiracy. *United States v. Ayala,* 601 F.3d 256, 267–68 (4th Cir.2010)." *United States v. Medford*, 661 F.3d 746, 750 n.4 (4th Cir. 2011).

were assigned. The Fourth Circuit affirmed the admission of these documents:

> First, the indictment specifically charged the Appellants with conspiring with, among others, "agents and officers of the GDR," ..., and the government presented ample evidence supporting that allegation, including the government's overwhelming evidence of the Appellants' relationship with Lothar Ziemer, whose signature appears on many of the disputed HVA documents. Second, although some of the documents are undated, many bear dates that are clearly within the course of the conspiracy as defined by the government's evidence. And many of the undated HVA documents show the same registration number as the dated documents and the documents bearing Ziemer's signature, thus establishing a connection between all of the HVA documents. Accordingly, the government's evidence demonstrated that the statements were made during the course of the conspiracy. Third, there can be no real dispute that, by compiling the information contained in the disputed documents – the Appellants' real and code names, their addresses, the object of their assignments, how they could be contacted – the GDR was acting in furtherance of the conspiracy.

> While the identity of the declarant of the unsigned documents may not be known, the only conclusion that can be drawn from the information included in the documents – information that was corroborated in many respects by [a witness]'s testimony and by Squillacote's own statements to the undercover agent – is that the documents were created by or at the direction of East German agents who had knowledge of and were involved in the conspiracy with the Appellants. While there may be cases where the inability to identify the declarant of an alleged co-conspirator's statement could render the statement inadmissible, this is not one of those cases. The HVA documents were sufficiently connected to each other and to the conspiracy established by the government's evidence to make them reliable and admissible under Rule 801(d)(2)(E), notwithstanding the government's inability to identify the declarants....

> We therefore conclude that the HVA records were properly authenticated and were properly admitted as statements of co-conspirators. The Appellants' complaints about the reliability of the HVA records, including the fact that the government purchased the documents from unidentified sources, merely go to the weight to be accorded the records by the jury, and not to the admissibility of the records....

*Id.* at 563-64 (citations and footnote omitted).

In this case, where the indictment specifically alleges that defendant conspired with

the Iranians and others to broker the launch of an Iranian satellite on a POLYOT rocket,

13

Gorlov's statements clearly qualify for admission under Rule 801(d)(2)(E).  As established

by multiple exhibits and witnesses, Modanlo and Gorlov worked closely together for

several years on the FAISAT satellite launches (the experimental satellites launched in

1995 and 1997 and a small beacon launched in 2000) and other negotiations between

Modanlo's businesses and POLYOT.  In late 2000 and early 2001, Gorlov ends up in the

middle of communications between the Russian entities and the Iranian entities about

Iran's interest in a satellite program.  Throughout this process, Gorlov sends faxes of the

Russian-Iranian communications which go, directly or indirectly, into the "Nader" file

maintained by Modanlo's agent.  Several of the documents reference co-conspirators –

Gorlov, Malmirian and Aladpoosh – and seek a co-conspirator's aid in making the visit

feasible. The clear inference to be drawn from these faxes is that Gorlov was keeping his

American coconspirators informed about the progress of the Russian-Iranian satellite

efforts.  There is ample evidence to support the fact that a conspiracy was afoot, it included

Modanlo and Gorlov, and Gorlov's statements were in furtherance of the conspiracy.  All

document re-transmitted by Gorlov are therefore admissible as coconspirator statements.

### B.   The Contents of Several Documents from Segel's "Nader" File Are Not Statements Because They Make No Assertions

**SW SEGAL 1, 6, 7** and **14** are admissible as non-hearsay for another reason -

namely, that they make no factual assertions, and therefore do not rise to the level of a

statement.  The use of the word "statement" in Rule 801(a) is a critical component of the

hearsay rule.  *Lorraine v. Markel American Ins. Co.,* 241 F.R.D. 534, 563 (D. Md. 2007).

Then-Magistrate Judge Grimm quoted evidence treaties, including Jack B. Weinstein &

Margaret A. Berger, *Weinstein's Federal Evidence* § 801.10[1] (2d ed.1997) ("Because Rule

14

801 describes hearsay as an out-of-court *statement* offered as proof as [sic] the matter asserted, the definition of 'statement' is of critical importance."), and Stephen A. Saltzburg et al., *Federal Rules of Evidence Manual*, § 801.02[1][c] (9th ed.2006) ("If proffered evidence is not a 'statement' within the meaning of Rule 801(a), then it cannot be hearsay, and so cannot be excluded under the [hearsay] Rule.").  As Judge Grimm observed, "[t]he word [statement] is used in a very precise, and non-colloquial sense-it only applies to verbal conduct (spoken or written) or non-verbal conduct that is intended by a human declarant to be *assertive.*"  *Lorraine,* 241 F.R.D. at 563.  The advisory committee notes to Federal Rule of Evidence 801(a) explains that: "[t]he definition of 'statement' assumes importance because the term is used in the definition of hearsay in subdivision (c). The effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. The key to the definition is that nothing is an assertion unless intended to be one").  *See United States v. Cassano,* 372 F.3d 868, 882 (7th Cir. 2004).

"Although there is not universal agreement on this point, it appears that for verbal or nonverbal conduct to fall within the definition of the hearsay rule as defined under the federal rules of evidence, it must be either an expressly assertive written or spoken utterance, or nonverbal conduct expressly intended to be an assertion-the federal rules appear to have excluded from the definition of hearsay "implied assertions"-or unstated assertions that are inferred from verbal or nonverbal conduct."  *Lorraine,* 241 F.R.D. at 563; *United States v. Flores*, 286 F. App'x 206, 213 (5th Cir. 2008) ("We have held that Rule 801 removes implied assertions from the coverage of the hearsay rule"); *United States v.*

15

*Groce*, 682 F.2d 1359, 1364 (11th Cir. 1982); *United States v. Zenni*, 492 F. Supp. 464, 468-69 (E.D. Ky. 1980) ("the drafters of the Federal Rules [rejected the common law rule that] implied assertions should be treated as hearsay and expressly abolished it.").

In **SW SEGAL 1, 6, 7** and **14,** the author is not asserting anything, but instead requests or invites the recipient to do something for him.  In **SW SEGEL 1**, the requestor, Modiri**,** tells Gorlov, "I would kindly ask you to arrange a visit ...."  In **SW SEGEL 6**, the requestor, B. Obnosov, writes to Malmirian and tells him, " we'd like to inform you that we are going to host your delegation ...."  Later, he asks Malmirian to "please advise us about the period of the visit ...," "please send us your delegation's passports ...," and "please confirm that all expenses related to the visit will be charged to your account ...."  **SW SEGEL 7** contains similar language, in which Obnosov again asks Malmirian " to inform ... Polyot of all the details concerning flight numbers ... hotel reservations [and proposed] dates for negotiations," as well as to "provide the aforesaid information" in advance of arrival.

**SW SEGEL 14** likewise tells Gorlov that "the chief of the experimental department of the Remote Sensing Institute ... has asked about organizing a visit ..., and that to set up the program Gorlov is "request[ed] to order" certain materials to be sent in advance.  In all of these cases, the writer either invites the recipient to do something or asks the recipient for further information.  "The words allegedly spoken by the invitor do not rise to the dignity of a 'statement' because they do not constitute an 'assertion.'" *United States v. Gordon,* 936 F.2d 573, *3 (6th Cir. 1991)(unpublished opinion).  "Testimony that 'John Doe spoke to me on Tuesday and said "please join the drug ring" is not hearsay because the words attributed to John Doe do not assert anything." *Id.*

Similarly, to the extent that the documents make inquiries about visits or ask for additional information, they contain no statements. "[Q]uestions are not 'statements' and therefore are not hearsay." *United States v. Love*, 706 F.3d 832, 839 (7th Cir. 2013)(citing *United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006); *United States v. Thomas,* 451 F.3d 543, 548 (8th Cir. 2006); *Lexington Ins. Co. v. W. Pa. Hosp.,* 423 F.3d 318, 330 (3d Cir. 2005); *United States v. Wright,* 343 F.3d 849, 865 (6th Cir.2003); *United States v. Jackson,* 88 F.3d 845, 848 (10th Cir. 1996); *United States v. Lewis,* 902 F.2d 1176, 1179 (5th Cir. 1990); *United States v. Oguns,* 921 F.2d 442, 449 (2d Cir. 1990)). "Because a question cannot be used to show the truth of the matter asserted, the dangers necessitating the hearsay rule are not present." *Oguns*, 921 F.2d at 449.

Under these principles, there is no hearsay issue with respect to **SW SEGEL 1**, in which Mr. Modiri of the Iranian Institute of Survey Engineering requests that Gorlov "to arrange a visit from the satellite and lunch [sic] production facilities" for six Iranian visitors, including Malmirian and Aladpoosh. The letter is merely an inquiry about the possibility of an Iranian visit to POLYOT. **SW SEGEL 6** sets forth another inquiry – Obnosov's request that Malmirian "please advise . . . about the period of the visit and the flight details as soon as possible" and to "please send us your delegation's member's passport copies by fax or through your Embassy in Moscow," and "please confirm that all expenses related to the visit shall be charged to your account except for those ones in Omsk." **SW SEGEL 7** asks Malmirian to inform the Russians and provide them with travel details and confirm expenses. In **SW SEGEL 14**, Yarmolyuk asks Gorlov to provide certain information, such as "preliminary presentation materials on the Sina project" and "anticipated expenses for the

Iranian side" so that "a visit to Russia by a delegation of Iranian specialists" may be arranged.  In each case, the inquiries are not hearsay.

> ### C. Viewed Both as Gorlov's Faxes and on Their Face, The Contents of the All Documents from Segel's Folder Are Offered to Show Connections Among Conspirators, Not for the Truth of the Matters Asserted, And Are Not Hearsay

The Fourth Circuit repeatedly has held that because a conspiracy is by its nature clandestine and covert, it is generally proved by circumstantial evidence.  *United States v. Burgos,* 94 F.3d 849, 857 (4th Cir.1996) (en banc). Evidence tending to prove a conspiracy may include a defendant's relationship with other members of the conspiracy, and the existence of a conspiracy "may be inferred from a development and collocation of circumstances." *Id.* at 858 (internal quotation marks omitted).  As a result, a variety of nonhearsay evidence demonstrating some link in the conspiratorial chain is admissible, subject to appropriate limiting instructions.  Just last month, in *United States v. Cone*, ___ F.3d ___, 2013 WL 1502007 (4th Cir. April 15, 2013), the Fourth Circuit affirmed the admission of out-of-court declarations by non-parties that demonstrated the conspiracy defendant's knowledge and notice.  In that case, co-defendants Cone and Zhao were convicted of conspiracy and substantive charges relating to a scheme in which their business, JDN Networking, Inc. ("JDC"), imported and resold counterfeit pieces of computer networking equipment, some of which bore the trademark of Cisco Systems, Inc. ("Cisco").  The district court admitted "e-mails from JDC customers characterizing certain Cisco products purchased from JDC as 'fake' or 'counterfeit' ... on the grounds that the e-mails were to be admitted not for their truth, but rather, as evidence that Zhao and Cone were on notice that the products JDC sold were not authentic." *Id*. at *4.  The Fourth

Circuit held:

> we believe that the district court properly admitted the e-mails for the non-hearsay
> purpose of showing that Cone and Zheo were on notice as to the counterfeit
> nature of the goods they sold.  *See* 5-801 *Weinstein's Federal Evidence*
> § 801.11[5][a](Out of court statement not hearsay when "offered not for [its] truth
> but to prove the extent of ... a recipient's notice of certain conditions").

*Id.* at *20.[3]

*Cone* is consistent with a long line of cases from other courts of appeals admitting

documents seized from a variety of sources – including locations other than the defendant's

own person, residence or business – for the non-hearsay purpose of circumstantially proving

a defendant's connection to conspiratorial conduct.  *See United States v. Hensel,* 699 F.2d

18, 35 (1st Cir.1983) (list of names nonhearsay to show participation in conspiracy through

inference that member of conspiracy possessed list but not from accuracy of the list itself);

*United States v. Anello*, 765 F.2d 253, 261 (1st Cir. 1985)(Breyer, J.); *United States v.*

*Sliker*, 751 F.2d 477, 489 (2d Cir. 1985)(Friendly, J.)("Most of the documents [seized by

foreign authorities] were not hearsay at all; they were admitted not to establish the truth of

the matters asserted but rather to prove the [criminal scheme] and to link the defendants to

it"); *United States v. Panebianco*, 543 F.2d 447, 456-57 (2d Cir. 1976)(entry in

coconspirator's address book including nickname of other conspirator offered as evidence of

"additional transactional link" in conspiracy and not for truth of the matter asserted); *United*

*States v. Ruiz*, 477 F.2d 918, 919 (2d Cir. 1973)(documents admitted merely to support

---

[3]      The court of appeals did not approve of the district court's failure to give an
appropriate limiting instruction.  *Id.*  In this case, if the Court admit the challenged documents,
the government requests that the court give appropriate limiting instructions, consistent with its
rulings on various documents.

inference that defendant and coconspirator knew each other); *United States v. Oguns,* 921 F.2d 442, 449 (2d Cir.1990) ( "[t]he fact that an out-of-court statement is used to provide circumstantial evidence of a conspiracy does not require that the statement be analyzed under the co-conspirator exception to the hearsay rule"); *United States v. McGlory*, 968 F.2d 309, 333 (3d Cir. 1992)(documents containing name of coconspirator "contained the name [of the coconspirator] and was offered merely as circumstantial evidence of [defendant's] association with him"); *United States v. Mazyak*, 650 F.2d 788, 792 (5th Cir.1981) (admitting letter for nonhearsay purpose of showing association among defendants); *United States v. Day,* 591 F.2d 861, 883–85 (D.C. Cir.1978) (admitting slip of paper listing names and phone number of defendants where slip was not offered to prove that defendants in fact had such phone numbers, but for nonhearsay purpose of showing an association between victim and defendants named on slip); *United States v. Tamura*, 694 F.2d 591, 597–98 (9th Cir.1982) (telexes received by defendant admissible to show his knowledge of bribery scheme and thus prove his participation in it); *United States v. Beecroft,* 608 F.2d 753, 760–61 (9th Cir.1979) (contents of financial report admissible for nonhearsay purpose of demonstrating defendant's knowledge of the figures set forth therein, and thus as circumstantial evidence of the defendant's awareness of and participation in scheme to defraud). *United States v. McIntyre*, 997 F.2d 687, 703 nn.17-18 (10th Cir. 1993)(collecting cases and scholarly authorities).  Of particular note is that business cards are admissible to show the relationship of conspirators to each other or to an item seized.  *See, e.g., United States v. Thornton*, 197 F.3d 241, 251 (7th Cir. 1999); *United States v. Mejias*, 552 F.2d 435, 446 (2d Cir. 1977).

Against this background, all of the remaining documents from **SW SEGEL 16** are

nonhearsay.  **SW SEGEL 1**, Gorlov's fax of Modiri's letter requiring Gorlov "to arrange a

visit from the satellite and lunch [sic] production facilities" for six Iranian visitors, including

Malmirian and Aladpoosh, is admissible irrespective of anything that Modiri or Gorlov

asserts, but simply to prove that Gorlov communicated to Modanlo's agent, Segel, the

Iranians' inquiry about the possibility of a visit to POLYOT.  The letter constitutes

circumstantial evidence of Modanlo's association with a venture that involved

communications between Russian and Iran and referenced coconspirator Malmirian and

Modanlo's employee Aladpoush.  The same holds true for **SW SEGEL 15A** (December 10,

2001 letter from Aviaexport to Gorlov concerning "talks with a foreign customer" for

launch of a satellite with specific characteristics in the fourth quarter of 2003);

**SW SEGEL 5** (April 8, 2002 letter from Rosoboronexport to Malmirian "to confirm the

fact that Rosoboronexport and Polyot came to a decision on joint participation in the

Project.  In this regard we are doing preliminary steps to organize your delegation visit to

Russia to hold technical discussions with Polyot, Opteks, and OKB MEI"), **SW

SEGEL 14A** (April 8, 2002 letter from Rosoborneksport to the Chief Designer - Director,

"Polyot" Design Bureau, in Omsk, concerning "a visit to Russia by a delegation of Iranian

specialists" to discuss "issues related to the implementation of the SINA project"); **SW

SEGEL 6** (April 17, 2002 letter from Rosoboronexport to Malmirian confirming a 10-day

visit in the second half of May); and  **SW SEGEL 7** (May 7, 2002 letter from

Rosoboronexport to Malmirian confirming the arrival of an Iranian group in Omsk on

May 12, 2002).  As above, these documents are not offered for the truth of any particular

assertion about the talks or the launch, but to prove the American conspirators' links to documents referencing such talks and launch schedule.  Similarly, **SW SEGEL 11-13** – copies of Appendices A ("Price & Payment Schedule"), E ("Schedule") and G ("Figure 1") to the SMALL-SAT contract between the Russians and Iranians, which include references activity at "Contractor's site" and "Beneficiary's site" – are exact copies of schedules appended to the copy of the SMALL-SAT contract later seized from Gorlov by Customs agents at Dulles Airport, which will be introduced later in trial as **CUSTOMS 1**, and of a copy of Appendix C that appears in defendant's files.  **SW FAI 41**.  Again, the significance is offered not for the truth of any fact set forth in Appendix A, E or G but for the significance of Modanlo's agent's possession of these documents in a "Nader" file.

> **D.**     **The Contents of Several Documents from Segel's "Nader" File Are Admissible Under Fed. R. Evid. 803(3) as Evidence of the Declarant's Intent**

Several other documents are also admissible under a longtime hearsay exception now set forth in Fed. R. Evid. 803(3), which permits admission of a statement that represents "a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health)." Fed.R.Evid. 803(3). The threshold requirements for invoking this hearsay exception are that (1) the statement must be contemporaneous with the mental state sought to be proven; (2) there must be no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his or her thoughts; and (3) the declarant's state of mind must be relevant to an issue in the case. *United States v. Neely,* 980 F.2d 1074, 1083 (7th Cir. 1992); *United States v. Faust,* 850 F.2d 575, 585 (9th Cir. 1988). On the question

of relevance, "the declarant's statement of mind must be relevant to some issue in the case before such testimony can be admitted under Rule 803(3)." *United States v. Veltmann,* 6 F.3d 1483 (11th Cir. 1993). These statements of intent can be used as circumstantial evidence both that the declarant intended to perform the act and that the declarant did, in fact, act in accordance with his plan. *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285 (1892); Fed. R. Evid. 803(3), advisory committee notes ("The rule of *Mutual Life Ins. Co. v. Hillmon* . . . allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed."); *Allen v. Sybase, Inc*., 468 F.3d 642, 656-657 (10th Cir. 2006); *United States v. Donley*, 878 F.2d 735, 738 (3d Cir. 1989) ("Statements admitted under Fed. R. Evid. 803(3) to show the declarant's intent or plan may be used  to show that the declarant acted in accord with that plan."); *Allen v. Sybase, Inc*., 468 F.3d 642, 656 (10th Cir. 2006) (same); *Kos Pharms., Inc. v. Andrx Corp*., 369 F.3d 700, 719 (3d Cir. 2004) (same).

Under these principles,  **SW SEGEL 1** is admissible to show the Iranians' intent – their desire to secure an invitation from the Russians to visit satellite and launch production facilities – is a significant piece of the larger picture of the defendant's participation in an illegal conspiracy to broker the Iranian-Russian arrangement.  The letter may be introduced not only to illustrate Modiri's state of mind, but also to show that Modiri arranged for the visit to take place. **SW SEGEL 15** illustrates the Russian entities' willingness – their intent – to continue "talks with a foreign customer on a project that will provide for the development, manufacture and launch of a microsatellite to provide data transmission" and that "to hold additional talks to define the conditions of the Polyot ... participation in the

project."  **SW SEGEL 5** shows the intent of Rosoboronexport and Polyot to organize a visit of the Iranian delegation to hold technical discussions with Polyot, Opteks, and OKB MEI." **SW SEGEL 14** discusses plans by Rosoborneksport to conduct talks at some future date to discuss "issues related to the implementation of the SINA project."  **SW SEGEL 6** describes to Malmirian Rosoboronexport's plans "to host your delegation in Russia in the second half of May."  The letter also indicates that the Russians "propose about 10 days for the visit," asks Malmirian to "advise [the Russians] about the period of the visit," "confirm expenses," notes that an official invitation "will be forwarded to [Malmirian] after "approval of our authorities is received."  It further asks Malmirian to send "delegation members passport copies" and that a "prompt reply will be highly appreciated."  Lastly, and in the same vein, **SW SEGEL 7** contains a representation to Malmirian from Rosoboronexport to Malmirian that the Iranian delegation "may arrive in Omsk on May 12, 2002."

## CONCLUSION

For these reasons, government exhibits **SW SEGEL 1, 2/2A, 5, 6, 7, 11, 12, 13, 14/14A and 15/15A** should be admitted.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

_____
David I. Salem
Stuart A. Berman
Assistant United States Attorneys

Molly E. Thebes
Special Assistant United States Attorney

6406 Ivy Lane, Suite 800
Greenbelt, MD 20770
(301) 344-4433

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on May 6, 2013, I electronically filed the foregoing

pleading with the Clerk of Court using the CM/ECF System, which will electronically serve

the foregoing document on the following parties, who are registered CM/ECF users:

> Lucius Outlaw, Esq.
> Douglas Miller, Esq.
> Elizabeth G. Oyer, Esq.
> Assistant Federal Public Defenders
> Tower II, 9th Floor
> 100 South Charles Street
> Baltimore, Maryland 21201-2705

> _____/s_____
> David I. Salem
> Assistant United States Attorney