## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          *

v.                                *          Criminal No. PJM-10-0295

NADER MODANLO et al.              *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

### DEFENDANT NADER MODONLO'S MEMORANDUM IN OPPOSITION TO ADMISSION OF DOCUMENTS SEIZED FROM RESIDENCE OF YAKOV SEGEL

Mr. Nader Modanlo, by and through his undersigned counsel, hereby submits this memorandum in opposition to the admission in evidence of the remaining disputed documents seized from the residence of Yakov Segel.

### BACKGROUND

The above-captioned matter is currently in trial. The government sought to admit into evidence certain documents[1] allegedly seized from the residence of Mr. Yakov Segel, who is not a party to the proceedings and whom the government has indicated it does not intend to call as a witness. The defense objected on grounds of hearsay and lack of authentication. The Court took the matter under advisement and directed the parties to brief the issues presented. The government has submitted a memorandum in support of admission (Dkt. 343) ("Gov't Mem."); the present memorandum responds to that pleading.

---

[1] The documents are identified as exhibits SW SEGEL 1, SW SEGEL 2/2A, SW SEGEL 5, SW SEGEL 6, SW SEGEL 7, SW SEGEL 11, SW SEGEL 12, SW SEGEL 13, SW SEGEL 14/14A, and SW SEGEL 15/15A. (Where applicable, the "A" version of the exhibits are English translations of Russian originals.)

1

## ARGUMENT

## I. THE DOCUMENTS ARE NOT AUTHENTICATED.

The government has at its disposal a means to authenticate these documents. It can call Yakov Segel. Mr. Segel lives in Maryland, has been a cooperating witness for the government for years, and it is Mr. Segel's house from which these documents were seized. The government's gambit of putting these documents on through an agent is simply an attempt to avoid calling Mr. Segel, whom the government knows would give testimony exculpating Mr. Modanlo and would be cross-examined regarding the multiple, unsuccessful attempts he made to elicit and record incriminating statements from Mr. Modanlo and others.

In an April 16, 2013 disclosure under the *Jencks* Act, the government indicated that "Mr. Segel, in a meeting held this date, stated that he did not know of any meeting held among Nader Modanlo, POLYOT officials and the Iranians in Russia. Mr. Segal also stated that he possessed no knowledge of Modanlo setting up any deal between the Russians and Iranians and that Modanlo was probably following the Russian-Iranian satellite venture because Vasily Gorlov was frequently talking about the matter." During the initial argument on the present objection, counsel for the government stated that he would not be calling Mr. Segel because "he's no longer telling the truth" (or words to that effect.)[2] The defense submits that it is equally possible Mr. Segel is no longer telling the government what he thinks it wants to hear, and is now telling the truth for the first time.

In any event, the mere fact that an agent has seen a document is not a sufficient basis on which to authenticate it. *See, e.g., United States v. Netschi*, 11-1828-cr, 2013 WL 452440, *3 (2d Cir. Feb. 7, 2013) (district court correctly excluded emails when introduced through investigator rather then a sender or recipient); *Railroad Management Co., LLC v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 419-20 (5th Cir.2005) (district court correctly excluded assignment agreement where it had been produced by proponent with no record evidence that opponent had acknowledged facts

---

[2] The defense has been unable to obtain a rush transcript of those proceedings because the court reporter who transcribed them has been on vacation.

which would authenticate it); *United States v. Perlmuter*, 693 F.2d 1290, 1293 (9th Cir. 1982) (testimony of INS agent not sufficient to support introduction of foreign report detailing criminal record; "the rules offer no third means of authentication; certainly it is not enough that the documents present an 'aura of authenticity.'")

The government argues that Mr. Segel is a "co-conspirator" and this status somehow authenticates the documents. Even were this dubious proposition true as a matter of law, the record evidence is insufficient to establish a conspiracy or Messrs. Modanlo or Segel as conspirators. The evidence establishes that Mr. Segel worked as a translator and logistical arranger for Mr. Modanlo in his legitimate business. Tatiana Lawrence's ever-changing recollections of Mr. Segel's presence with Mr. Modanlo at a meeting with Polyot and unspecified "Middle Easterners" who spoke "a language other than Russian or English" is hardly sufficient to establish a conspiracy for Mr. Segel to be part of, let alone his role in it.

The Segel documents themselves at most show that Vasily Gorlov was keeping Mr. Segel apprised of a Polyot / Iran project. Such a project was not illegal for Polyot or Iran to engage in, nor would it be illegal for Mr. Segel or Mr. Modanlo to know of its existence. And indeed, the Segel documents do not once mention Mr. Modanlo's name. In fact, several of the documents seem to provide evidence *against* the idea that Mr. Modanlo or Final Analysis were involved in the project; SW SEGEL 5, 6, 7, and 14 suggest that the Russian governmental agency Rosoboronexport may have been the intermediary between Polyot and Iran; SW SEGEL 15 suggests the initial intermediary may have been the Russian public company Aviaexport. Thus, even if "found in co-conspirator's house" were a legitimate basis for authentication, it would not be satisfied here where the government has failed to establish either conspiracy or conspirator.

Moreover, the equities balance strongly against allowing the documents in without Mr. Segel's testimony. As prior pleadings in this matter have demonstrated, Mr. Segel over a period of years met with the government, wore recording devices, made consensually monitored calls, and otherwise assisted in the investigation. Mr. Segel could authenticate these documents; the

government should not be able to hide behind an agent to avoid damaging cross-examination of its erstwhile cooperator.

## II.     THE DOCUMENTS ARE INADMISSABLE HEARSAY.

Each of the documents consists of one or more statements made by an out-of-court declarant, offered to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(a)-(c).  None of these statements is excluded from the definition of hearsay under Fed. R. Evid. 801(d).  None falls within any hearsay exception under Fed. R. Evid. 803 or 804.  As such, the statements constitute inadmissable hearsay and should be excluded pursuant to Fed. R. Evid. 802.  Each document is addressed in turn below.

### A. SW SEGEL 1 (LETTER FROM "M. MODIRI" TO VASILY GORLOV)[3]

This letter is offered to establish the truth of the following out-of-court statements made therein by the declarant "M. Modiri": the express assertions that (1) the "visitors" to Polyot's satellite and launch production facilities would be the persons listed, including Hamid Malmirian and Ali Aladpoush; (2) these "visitors" held passports issued in Tehran, i.e. were Iranian nationals; and (3) a visit by personnel acting on behalf of the Iranian Institute of Survey Engineering (I.S.E.) to Polyot's satellite and launch production facilities "would be useful and constructive for the discussion of potential future cooperation"; as well as the implied assertion that (4) M. Modiri expected such a visit to take place.

These statements are inadmissable hearsay.

#### 1. The Government's "Gorlov Fax Header" Argument Is Unavailing.

The government incorrectly argues that the appearance of Vasily Gorlov's fax header on this document transforms this statement by "M. Modiri" into a co-conspirator statement of Gorlov.  In

---

[3] This discussion of SW SEGEL 1 will respond at length to each of the government's four legal arguments addressing the hearsay objection.  Discussions of subsequent documents will incorporate these responses by reference as appropriate and therefore be considerably shorter.  (The government does not raise all four arguments with respect to every document at issue.)

other words, it contends that by faxing this document, Gorlov "adopted" its content as his own statement.

In so doing, the government impermissibly conflates two distinct hearsay exemptions: co-conspirator statements under R. 801(d)(2)(E) and adoptive admissions under R. 801(d)(2)(B). But R. 801(d)(2)(B) makes clear that a statement qualifies as an adoptive admission only where adopted *by the party against whom it is offered*. Nothing in R. 801(d)(2)(E) suggests that the interpolation of an alleged co-conspirator may be used to circumvent this fundamental limitation on the use of "adoptive admissions."

Thus, even assuming *arguendo* that the letter was "adopted" by Gorlov, it could not be introduced against anyone other than Gorlov himself, who is not a party. *See, e.g., United States v. Nava-Salazar*, 735 F. Supp. 274, 277 (N.D. Ill. 1990) ("even if the court determined that there was a clear manifestation of intent to adopt, that would not establish the admissibility for their truth of [declarant] Reina's statements, as adopted by [unindicted co-conspirator] Diego, against Diego's co-conspirators.); *United States v. Molina*, No. 88 CR 823-2, 1989 WL 85011 (N.D.Ill. July 19, 1989) (slip op. at 4-7) ("'Adoptive admissions' also cannot be introduced against a coconspirator through the coconspirator exception to the hearsay rule. . . .The fact that the statement is adopted does not transform [it] into a coconspirator statement for purposes of Rule 801(d)(2)(E). To allow such a 'tag-team' operation of the Rules of Evidence would circumvent Rule 801(d)(2)(B)'s prohibition against admitting the adoptive admissions of one party against other parties not privy to the conversation in which the statements were adopted. Because the . . . statements are not independently admissible *against [defendant] Molina* under either 801(d)(2)(B) or 801(d)(2)(E), the Court rules that the one adopted . . . statement may not be introduced against Molina for its truth.) (Emphasis in original.)

Moreover, even were "adoptive co-conspirator statements" a valid hearsay exemption, there no support for the government's theory that Gorlov's mere act of faxing without comment a third-party-authored document somehow transforms it into Gorlov's own statement. Indeed, the case law

suggests to the contrary.  *See, e.g., In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2719, 2012 WL 85447, *4 (E.D. La. Jan 11, 2012) ("the fact that a party's employee forwarded an email originating from outside his employer does not necessarily constitute an adoption of the contents of the forwarded email. . . . [A] forwarded email is only an adoptive admission if it is clear that the forwarder adopted the content or believed in the truth of the content."); *United States v. Safavian*, 435 F. Supp. 2d 36, 43-44 (D.D.C. May 23, 2006) (admitting certain emails where context and content clearly indicated that forwarding individual manifested adoption of or belief in truth of author's statements; declining to admit other emails not clearly demonstrating forwarder's adoption of the emails' content).

The central test for "adoption" is whether the party "*manifested* that it adopted or believed to be true" the statement.  Fed. R. Evid. 801(d)(2)(B).  Absent such a manifestation, there is no adoption—even where a party has used or relied on the statement.  *See generally* 156 A.L.R. Fed. 217, Admissibility of Statement Under Rule 801(D)(2)(B) of Federal Rules of Evidence, § 22[b] (collecting cases ).  But again, the issue of whether faxing a document constitutes "adoption" should not even be reached where, as here, the document is being offered against someone other than the putative adopter.

The government's claim that "Gorlov's retransmission of the documents was its own 'statement,' specifically a written assertion of documentary information relating to the Russian-Iranian satellite project," Gov't Mem. 11, suffers from all of the infirmities above and more.  First, the mere act of faxing does nothing to manifest adoption or belief.  Second, this claim is completely inconsistent with the government's later argument that implied assertions are not "statements" within the meaning of R. 801(a).  Third, it does nothing to address the R. 805 problem that hearsay-within-hearsay is admissible only where "each part of the combined statements conforms with an exception to the rule."  So even if the implied "statement" of Gorlov re-transmitting this letter rendered certain portions of the "M. Modiri" letter admissible (e.g. the letterhead, date, greeting and salutation)—which it does not—the hearsay statements of "M. Modiri" would remain inadmissible.

Moreover, it is not at all clear that Gorlov can be considered a co-conspirator under the rationale offered by the government.  See Gov't Mem. 13-14.  The government points to the conspiracy alleged in the Indictment, *id.* at 13, but the Indictment is not evidence.  It points to Gorlov's work with Modanlo on FAISAT and other projects, *id.*at 14, but these projects were entirely legal.  It points to Gorlov's name in communications between Russia and Iran about Iran's interest in a satellite program, *id.*, but such communications were only illegal if a United States person was involved, i.e. only if one pre-supposes Modanlo's guilt.  It notes that several of the Segel documents "reference co-conspirators," *id.*, but this argument is circular, particularly where the alleged "co-conspirator" is Gorlov himself.  (It assumes the existence of a conspiracy, to prove that there were conspirators, to prove that there was a conspiracy.)  Absent a clear foundation that Gorlov is a "co-conspirator," R. 801(d)(2)(E) is inapplicable in any event.

For all of the foregoing reasons, the government's "Gorlov fax header" Argument does not render the out of court statements of "M. Modiri" (or any other statement in the "Segel documents") admissible.

### 2. The Government's "No Assertions" Argument Should Be Rejected.

#### a. Three of "M. Modiri's" Four Statements in the Letter Are Express Assertions.

The government argues that the letter does not contain any "assertion" and is therefore does not contain any "statement" within the meaning of R. 801(a).  Even without wading into the scholarly debate over implied assertions,  the claim is self-evidently wrong for three of the four identified statements in the letter.  "M. Modiri" makes the *express* assertions that (1) the "visitors" to Polyot's satellite and launch production facilities would be the persons listed (including Hamid Malmirian and Ali Aladpoush); (2) these "visitors" held passports issued in Tehran (i.e. were Iranian nationals); and (3) a visit by personnel acting on behalf of the I.S.E. to Gorlov's satellite and launch production facilities "would be useful and constructive for the discussion of potential future cooperation."  Such express assertions are clearly "statements" within the meaning of R.801(a).

So even accepting the government's argument that implied assertions can never be "statements," this reasoning would apply at most to the first paragraph of the letter. The fact that a document may contain one non-"statement" does not immunize other statements in the letter from the rule against hearsay.

### b. Implied Assertions Offered as Direct Evidence of the Defendant's Guilt (and Arguably All Verbal Implied Assertions) Should Be Excluded as Hearsay.

The first paragraph— Modiri's request that Gorlov "arrange" the visit—contains the further implied assertion that (4) Modiri expected the visit to take place. Here one enters a familiar battleground for evidence scholars, replete with embarking sea captains and letters written to putatively insane testators. *See Wright v. Doe d. Tatham*, 112 Eng. Rep. 488 (Exch. Ch. 1837) and 47 Rev. Rep. 136 (H.L.1838).

But one need not resolve the broader debate over implied assertions to recognize that there are particular dangers in admitting them against criminal defendants where the implied proposition goes directly to the defendant's guilt. An important line of cases holds that implied assertions are inadmissable for this purpose. For example, in *United States v. McGlory*, 968 F. 2d 309 (3rd Cir. 1992) the Third Circuit held that "owe sheets" documenting the transfer of heroin to the defendants were inadmissable hearsay because "the statements in the notes, although not technically assertions by [the declarant] were used [by the prosecutor] to imply the guilt of the defendants." *Id.* at 332-33 (citing *United States v. Reynolds*, 715 F.2d 99, 99-101 (3d Cir.1983) (admission of statement containing implied assertion was prejudicial error where "admitted into evidence against [defendant] and offered again by the government in its closing argument to the jury as circumstantial evidence of [defendant's] involvement in the conspiracy . . . as well as the substantive offenses . . . .))

The relevance of Modiri's first paragraph to the government's case—and the obvious reason for which they wish to introduce it— is not Modiri's literal request for Gorlov to "arrange" the visit. Rather it is the fact, implied in his request, that such a visit was expected to happen. The interaction between I.S.E. and Polyot at the latter's "satellite and launch production facilities" is precisely the

relationship that Mr. Mondanlo is alleged to have brokered, and proof of its existence goes directly to his guilt.  The dangers of allowing this "proof" to come from the unobserved, untested, un-cross-examined words of "M. Modiri"—about whom nothing else is known—are precisely the dangers against which the rule against hearsay stands as a bulwark.[4]

---

[4]  Moreover, as the government's primary case acknowledges, the broader implied assertion question is not subject to "universal agreement." *Lorraine v. Markel American Ins. Co.*, 241 F.R.D. 534, 563 (D. Md. 2007).   The traditional common law view was that both verbal and nonverbal implied assertions constituted hearsay. *See Wright*, 112 Eng. Rep. at 515-517 (letters to testator were hearsay when offered to prove truth of declarants' implied belief in testator's sanity (i.e. verbal implied assertions); opinion discusses hypothetical in which sea captain's act of embarking with his family would be hearsay if offered as proof that vessel was seaworthy, consistent with captain's implied belief (i.e. nonverbal implied assertion.))

The adoption of the Federal Rules of Evidence unambiguously exempted the second category—unintended nonverbal implied assertions such as boarding a ship—from the definition of "statement." R. 801(a) provides that "'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."  Left ambiguous by the text is whether the qualifier "if the person intended it as an assertion" modifies only the last item in the list (nonverbal conduct), or all items in the list including oral and written assertions.

While the advisory committee note suggests the latter interpretation, the Court is not bound by the advisory notes and may interpret the text as it finds appropriate.  The contrary view to the advisory notes is perhaps most clearly stated by Judge Higgenbotham's majority opinion in *Reynolds*:

> [S]tatements containing express assertions may also contain implied assertions qualifying as hearsay and susceptible to hearsay objections. This situation arises when "the matter which the declarant intends to assert is different from the matter to be proved, but the matter asserted, if true, is circumstantial evidence of the matter to be proved. In this situation too, the statement is subject to a hearsay objection." . . .

> In the instant case the government seeks to use [the statement at issue] as circumstantial evidence "for the purpose of establishing the existence of a conspiracy between the two defendants, as well as their joint participation in the substantive offenses." . . . As the government uses it, the statement's probative value depends on the truth of an assumed fact it implies.

> * * *

> Reynolds' statement in this case was not offered for the purpose of proving its express meaning — that Reynolds did not say anything about Parran. Rather it was offered for the implied assertion that Parran was involved in the crimes for which the two were charged and tried. Therefore, we hold that the statement here . . . constitutes hearsay because it was introduced to prove its implied assertion of

(continued...)

[4](...continued)

Parran's guilt. Moreover, it is not admissible under any exception to the hearsay rule. *Reynolds*, 715 F.2d at 103-04 (citations omitted.)  *See also Lyle v. Koehler*, 720 F.2d 426 (6th Cir.1983) (excluding letters coaching witnesses on false alibi testimony for defendant when offered to prove implied assertion that writer believed defendant needed an alibi.)

One commentator explains the problem with the advisory committee's view as follows:

> Of the four dangers giving rise to the hearsay exclusionary rule—perception, memory, sincerity, and ambiguity—the assertive/nonassertive distinction addresses only one: the danger of insincerity (i.e. intentional misrepresentation). If a declarant possesses no intention of asserting anything, it would seem to follow that he also possesses no intention of misrepresenting anything. It is a non sequitur to conclude from this, as the Advisory Committee has, that the remaining dangers of perception, memory, and ambiguity are automatically minimized with this assurance of sincerity. The logical link which the Advisory Committee finds between sincerity and error is simply nonexistent.

Paul R. Rice, *Should Unintended Implications of Speech be Considered Nonhearsay? The Assertive/Nonassertive Distinction Under Rule 801(a) of the Federal Rules of Evidence*, 65 Temp. L.Rev. 529, 531 (1992).

Another commentator suggests that absence of an intent to communicate actually increases the danger of misunderstanding:

> If there is a distinction in the ambiguity of intended and implied assertions, the distinction indicates that unintended implied assertions are inherently more ambiguous. When a declarant consciously intends to communicate with an observer, he desires his communication to be understood by that observer . . . .  With unintentional implied assertions, however, the declarant makes no effort to avoid ambiguity, because there is no intent to convey his message to anyone. Thus, unintentional implied assertions have an inherently greater potential to be more ambiguous than intended assertions. The Federal Rules have it backward by classifying the less ambiguous intended assertions as hearsay, while classifying the more ambiguous unintentional assertions as nonhearsay.

Ronald J. Bacigal, *Implied Hearsay: Defusing the Battle Line Between Pragmatism and Theory*, 11 S. Ill. U.L.J. 1127, 1132 (1987).

And a third commentator notes that while the risk of insincerity may be low in nonverbal conduct, it is fallacious to make the same assumption with words:

> The Advisory Committee's apparent attempted rejection of *Wright v. Doe d. Tatham* is as unfortunate as it is incorrect. When a statement is offered to infer the

(continued...)

10

### 3.    The Government's "Non-Hearsay Circumstantial Evidence" Argument Should Be Rejected.

Also unavailing is the government's contention that the document is not offered for a hearsay use but simply as "circumstantial evidence of Modanlo's association with a venture that involved communications between Russian and Iran and referenced coconspirator Malmirian[5] and Modonlo's employee Aladpoush."  Gov't Mem. at 21.  The document evidences the "venture" to which it supposedly links Modanlo only through the hearsay statements of Modiri that Malmiran and

---

[4](...continued)
declarant's state of mind from which a given fact is inferred in the form of an opinion or otherwise, since the truth of the matter asserted must be assumed in order for the nonasserted inference to be drawn, the statement is properly classified as hearsay under the language of [Fed. R. Evid] 801(c). Since the matter asserted in the statement must be true, a reduction in the risk of sincerity is not present. The Advisory Committee's reliance on the analogy to nonverbal nonassertive conduct where a reduction in the risk of fabrication is caused by a lack of intent to assert anything is thus clearly misconceived.

3 Michael H. Graham, Handbook of Federal Evidence § 801.7, at 73-77 (5th ed.2001) (citations omitted).  *See also* Rice, *supra,* at 534 ("this justification cannot be applied to implied statements from speech. Speech is a mechanism of communication; it is virtually always used for the purpose of communicating something to someone. It is illogical to conclude that the question of sincerity is eliminated and that the problem of unreliability is reduced for unintended implications of speech if that speech might have been insincere in the first instance.")

In light of the foregoing, the Court can and should reject the advisory committee's note and find that verbal implied assertions are "statements" subject to the rule against hearsay.  But again, the Court need not even reach this general proposition because of the specific dangers posed where, as here, an implied assertion is offered as direct evidence of a defendant's guilt.  And again, this entire question applies only to the first paragraph of Modiri's letter; the remainder consists of express assertions which are plainly "statements" under any reading of the Rules.

[5]    The evidence is also insufficient to establish Malmirian as a "co-conspirator" of Mr. Modanlo.  There has been evidence that Mr. Malmirian met with Urs Hausheer's partner Arthur Schilter near the time of Prospect Telecom's formation, and expressed an interest in purchasing airplanes for Mahan Airlines.  There has been no evidence that Mr. Modanlo and Mr. Malmirian were together at any meeting in Switzerland or anywhere in the world, let alone that the two ever discussed a satellite deal.

Aladpoush will be visitors to Polyot in a "useful and constructive [visit] for the discussion of potential future cooperation." Offering the document to prove the truth of those statements is indeed a hearsay use. And Gorvlov's alleged transmittal of this document to Segel does not circumvent the R.805 hearsay-within-hearsay problem.

Moreover, even if a valid non-hearsay purpose could be identified for this or any other of the SW Segel documents, the court should not presume that a limiting instruction would be sufficient to mitigate the prejudice to Mr. Modanlo from the hearsay statements reaching the jury. For example, in *United States v. Reyes*, 18 F.3d 65 (2d Cir. 1994), the trial court had admitted certain hearsay statements as "background" to explain an agent's state of mind at the time of the investigation. The appellate court noted that:

> Because the jury was instructed not to consider the out-of-court declarations as proof of the truth of what was said, technically no hearsay evidence was received. However, when the likelihood is sufficiently high that the jury will not follow the limiting instructions, but will treat the evidence as proof of the truth of the declaration, the evidence is functionally indistinguishable from hearsay. Whether such evidence may be received turns not merely on the delivery of a limiting instruction that the jury may be unable to follow, but on a more complex balancing of factors . . . .

*Id.* at 69. The court went on to apply a balancing test:

> [F]irst, whether the non-hearsay purpose by which the evidence is sought to be justified is relevant, i.e., whether it supports or diminishes the likelihood of any fact "that is of consequence to the determination of the action," *see* Fed. R.Evid. 401, and second, whether the probative value of this evidence for its non-hearsay purpose is outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement. . . . *Thus, contrary to the government's contention, the mere identification of a relevant non-hearsay use of such evidence is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice.* The greater the likelihood of prejudice resulting from the jury's misuse of the statement, the greater the justification needed to introduce the "background" evidence for its non-hearsay uses.

*Id.* at 70 (emphasis added and internal citations omitted.) *See also United States v. Cass*, 127 F.3d 1218, 1223 (10th Cir. 1999) ("Hearsay evidence that directly goes to guilt is particularly difficult to limit to background purposes."); *United States v. Forrester*, 60 F.3d 52, 59 (2d Cir.1995) ("The mere identification of a relevant non-hearsay use for such evidence, however, is insufficient to justify its

admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice.") (internal quotation omitted); *United States v. Alonzo*, 991 F.2d 1422, 1427 & n.5 (8th Cir. 1993) ("district court must control and limit the use of background hearsay statements as the trial develops" to avoid possible prejudice and because of the "seriously prejudicial" nature of certain background hearsay, the trial court cannot simply rely on cautionary instructions to prevent prejudice); *United States v. Evans*, 950 F.2d 187, 191 (5th Cir.1991) (evidence otherwise admissible as background "becomes inadmissible hearsay if it also points directly at the defendant and his guilt in the crime charged"); *United States v. Brown*, 767 F.2d 1078, 1084 (4th Cir.1985) (error to admit out-of-court statements as "background" where statements implicated defendant in charged crime and "effect of the evidence could only have been a substantial bolstering of the government's case by inadmissible hearsay.").

Here, immense prejudice would flow from the jury's consideration of the hearsay content for its truth.  If believed, M. Modiri's statements establish that Ali Aladpoush (whom the government will presumably argue is the same Ali Aladpoush who worked for Final Analysis) and Hamid Malmirian (whom the government will presumably argue is the same Malmirian present at the founding of Prospect Telecom) planned to visit Polyot on behalf of the I.S.E.  The statements suggest a project between the Iranian government and Polyot, a Modanlo employee's involvement in that project, and a person in common between that project and the Swiss meetings attendant to the founding of Prospect Telecom.  These are core elements of the scheme alleged in the indictment, and the government has not been able to prove them through the testimony of any witness.  To allow the jury to hear of them via rank hearsay is highly prejudicial and is beyond what a limiting instruction can cure.

### 4. The Government's Rule 803(3) (*Hillmon*) Argument Fails.

The government argues that the letter is admissible as evidence of state of mind / intent under R. 803(3).  First, three of the four statements are not states of mind or intent. Both (1) the names of the visitors and (2) the place of insurance of their passports (Tehran) are statements of fact.  The

statement that (3) a visit "would be useful and constructive for the discussion of potential future cooperation" is a statement of belief offered for its truth, which is explicitly forbidden under the Rule.

Modiri's request (in the first paragraph) for the visit to be arranged is arguably an implied assertion of intent—although this is once again inconsistent with the government's claim that "statements" cannot include implied assertions. But both the House Judiciary Committee notes published with the Rule and the case law make clear that the declarant's state of mind cannot be used to establish either the intent or the future behavior of other persons (Moridi is not listed among the visitors). *See* R. 803(3) Notes of Committee on the Judiciary, House Report No. 93–650[6] ("the Committee intends that the Rule be construed  to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295-300 (1892), so as to render statements of intent by a declarant admissible only to prove his future conduct, *not the future conduct of another person*")(emphasis added).  *See also Allen v. Sybase, Inc.*, 468 F.3d 642, 660 (10th Cir. 2006) (exception does not permit use of one person's statement to prove another's state of mind); *United States v. Joe*, 8 F. 3d 1488, 1493 n.4 (10th Cir. 1993) (wife's statement inadmissible to prove husband's intent); *Hong v. Children's Memorial Hosp.*, 993 F. 2d 1257, 1265 (7th Cir. 1993) ("the state of mind exception does not authorize receipt of a statement by one person as proof of another's state of mind") (citing 4 David W. Louisell & Christopher B. Mueller, *Federal Evidence* § 441 (1980) and H.R.Rep. No. 650, *supra*);  *United States v. Cintolo*, 818 F.2d 980, 1001 (1st Cir. 1987) (same).

Thus, R. 803(3) is facially inapplicable to three of the four statements in the letter, and the fourth (Modiri's request to arrange a visit) cannot be admitted to prove what others—Aladpoush, Malmirian, and the other "visitors"—later did.

---

[6] H.R.Rep. No. 650, 93d Cong., 1st Sess. (1973), reprinted in 1974 U.S.C.C.A.N. 7051, 7075, 7087 .

**B. SW SEGEL 2/2A (Handwritten Document Addressed to "J Segel")**

This document by an unknown declarant makes a series of statements about how governmental regulations apply to the export of documents, about how metals must be ordered, and that approval must be obtained for the export of metals and bearings.  It is presumably offered to establish that these exports and metal orders were in the process of planning or execution.  The government's "Gorvlov fax header" and "non-hearsay circumstantial evidence" arguments fail for the reasons stated in sections II.A.1 and II.A.3, *supra*.

**C. SW SEGEL 5 (April 8, 2002 letter from Rosobornexport to H. Malmirian)**

This letter from a Rosoboronexport official is introduced for the truth of the following statements: (1) that Rosoboronexpoert and Polyot came to a decision on joint participation in "the project"; (2) that Rosoboronexport is "doing preliminary steps to organize your delegation visit to Russia to hold technical discussions with Polyot, Opteks, and OKB MEI"; and (3) that persons unknown will inform Mr. Malmirian in advance about his itinerary.  The government's "Gorvlov fax header," "non-hearsay circumstantial evidence," and "statement of intent" arguments fail for the reasons stated in sections II.A.1,  II.A.3, and II.A.4., *supra*.

**D. SW SEGEL 6 (April 17, 2002 letter from Rosobornexport to H. Malmirian)**

This letter from a Rosoboronexport official is introduced for the truth of the express assertion that Rosoboronexport was going to host Malmirian's delegation in Russia for ten days in May, and the same implied assertion implicit in the remaining content of the letter.  The government's "Gorvlov fax header," "no assertions," "non-hearsay circumstantial evidence," and "statement of intent" arguments fail for the reasons stated in sections II.A.1, II.A.2,  II.A.3, and II.A.4., *supra*.

**E. SW SEGEL 7 (May 7, 2002 letter from Rosobornexport to H. Malmirian)**

This letter from a Rosoboronexport official is introduced for the truth of the express assertion that Rosoboronexport and Polyot had obtained approval for Malmirian's delegation to arrive in Omsk in May 2002, and the same implied assertion implicit in the remaining content of the letter. The government's "Gorvlov fax header," "no assertions," "non-hearsay circumstantial evidence,"

and "statement of intent" arguments fail for the reasons stated in sections II.A.1, II.A.2,  II.A.3, and II.A.4., *supra*.

**F. SW SEGEL 11 (Appendix A Price & Payment Schedule)**

This document is introduced for the truth of the statements that (1) the contract price for the alleged satellite project is $3.9 million; and (2) the payment schedule for the alleged satellite project is the schedule set out in the table.  The government's "non-hearsay circumstantial evidence" argument fails for the reasons stated in section II.A.3.

**G. SW SEGEL 12 (Appendix E Schedule)**

This document is introduced for the truth of the statement that the milestones, durations, and dates set forth in the table constituted a schedule for the alleged satellite project.  The government's "non-hearsay circumstantial evidence" argument fails for the reasons stated in section II.A.3.

**H. SW SEGEL 13 (Appendix G)**

Like the previous document, this document is introduced for the truth of the statement that the events, dates, durations, numbers of personnel, and locations set forth in the table constituted a schedule for the alleged satellite project.  The government's "non-hearsay circumstantial evidence" argument fails for the reasons stated in section II.A.3.

**I. SW SEGEL 14/14A (April 8, 2002 letter from Rosobornexport to Gorlov)**

This letter from a Rosoboronexport official is introduced for the truth of (1) the express assertion that the chief of the Remote Sensing Institute had asked about organizing a visit to Russia by a delegation of Iranian specialists in order to familiarize themselves with the Polyot experimental production base in Omsk and to conduct technical talks with specialsts from cooperating enterprises involving OPTEKS and OKB MEI on issues related to the implementation of the SINA project; and (2) the implied assertions implicit in the author's request for information and materials.  The government's "Gorvlov fax header," "no assertions," "non-hearsay circumstantial evidence," and "statement of intent" arguments fail for the reasons stated in sections II.A.1, II.A.2, II.A.3, and II.A.4., *supra*.

**J. SW SEGEL 15/15A (December 10, 2001 letter from Aviaexport to Gorlov)**

This letter from the director of Aviaexport is introduced for the truth of the express assertions that (1) Aviaexport was contemporaneously conducting talks with a foreign customer regarding a data transmission satellite project; (2) the anticipated realization date was Q4 2003; (3) the sattelite would be placed in sun-synchronous orbit with an altitude of up to 1000km; (4) the weight of the satellite would be 75kg; (5) the dimensions of the satellite were attached to the letter; (6) Aviaexport was requesting Polyot to work out the capability of launching this satellite as a supplemental payload on a Kosmos-3M rocket; and (7) Aviaexport was ready to hold additional talks if Polyot were interested in proceeding.  The government's "Gorvlov fax header," "no assertions," "non-hearsay circumstantial evidence," and "statement of intent" arguments fail for the reasons stated in sections II.A.1, II.A.2,  II.A.3, and II.A.4., *supra*.

## CONCLUSION

For the foregoing reasons, Mr. Modanlo respectfully submits that government exhibits SW SEGEL 1, 2/2A, 5, 6, 7, 11, 12, 13, 14/14A and 15/15A should be excluded from evidence.

Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland

_____/s/_____
LUCIUS T. OUTLAW III
DOUGLAS MILLER
ELIZABETH G. OYER
Assistant Federal Public Defenders
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Telephone: (410) 962-3962
Facsimile:  (410) 962-0872
Email: Douglas_Miller@fd.org

*Attorneys for Defendant Nader Modanlo*

17