

Our Ref:    50211.1

750 7th Avenue - 26th floor
New York, NY 10019

www.mishconnewyork.com

December 17, 2013

Direct Tel:   212-612-3262
Direct Fax:  212-612-3297
E-mail:       James.McGuire@Mishcon.com

**BY FEDERAL EXPRESS & ECF**

Honorable Peter J. Messitte
United States District Judge
United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770

    Re:    U.S. v. Nader Modanlo, et al.
            Case No. 10-cr-00295-PJM

Your Honor:

    Mr. Modanlo is scheduled to appear before the Court for sentencing on December 20, 2013 at 9:30 a.m. We write in advance of sentencing to outline the arguments we plan to present.[1]

## INTRODUCTION

    As the Court is aware, on June 10, 2013, a jury found Mr. Modanlo guilty of conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") in violation of 18 U.S.C. § 371 (Count 1); violation of the IEEPA, in violation of 50 U.S.C. § 1705(b) (Counts 3-4); money laundering, in violation of 18 U.S.C. §§ 1956 and 1957 (Counts 5-10); and obstruction of a bankruptcy proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count 11).

    On June 18, 2013, the government sent a letter to United States Probation Officer Mary Brewster outlining its position on sentencing ("Government Letter"). On September 10, 2013, Ms. Brewster filed a Draft Presentence Report ("Draft PSR"), which almost entirely parroted the government's position and recommended that Mr. Modanlo receive a Total Combined Offense Level of 36 under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").

---

[1] In submitting this correspondence, Mr. Modanlo in no way concedes that the District Court has jurisdiction with respect to any post-trial proceeding and specifically maintains that the District Court was entirely divested of jurisdiction with the filing of the May 13, 2013 Interlocutory Appeal. See Notice of Appeal, filed May 13, 2013 (Docket No. 353).

Legal1us.160288.10

Switchboard: +1 212 612 3270    New York:  Mishcon de Reya New York LLP    A list of partners is available for
Main Fax:  +1 212 612 3297      London:    Mishcon de Reya Solicitors       inspection at the above address

On October 10, 2013, we submitted a letter to Ms. Brewster outlining Mr. Modanlo's objections to the Draft PSR ("October 10 Letter"), a true and correct copy of which is annexed as Exhibit A. For the reasons presented in the October 10 Letter, which we incorporate herein by reference and plan to address at the sentencing hearing, we believe that Mr. Modanlo's Total Combined Offense Level under the Guidelines should be no higher than 16.

On November 22, 2013, Ms. Brewster filed her final Presentence Report ("PSR"), in which she rejected Mr. Modanlo's arguments and again recommended that he receive a Total Combined Offense Level of 36.

For the reasons set forth below-- broadly, that (i) the objectives of sentencing set forth in 18 U.S.C. § 3553(a)(2) can be achieved with a lesser sentence, and (ii) Mr. Modanlo's sentence should be in line with that of similarly situated defendants sentenced by other U.S. District Courts -- we respectfully request that the Court exercise its discretion to sentence Mr. Modanlo below the advisory Guidelines range and consider alternatives to incarceration.

## NADER MODANLO'S PERSONAL BACKGROUND

Mr. Modanlo is a 53-year old man with absolutely no criminal history prior to, or apart from, the present case.[2] He was born in 1960 in Iran, the second of four children, and had a stable upbringing in a household that held personal responsibility and educational achievement in high esteem. Mr. Modanlo's mother was a homemaker who died in 2009 at the age of 70, and his father was a farmer turned commercial property builder who died in April 2013 at the age of 83.

In 1979, after graduating from high school in Iran, Mr. Modanlo came to the United States to attend George Washington University. He graduated in 1983 with a Bachelor of Science degree in Mechanical Engineering. He continued on at George Washington, earning a Masters of Science Degree in Aeronautical Engineering in 1984 and worked toward his Doctorate Degree in Fluid Mechanics and Thermal Sciences until 1989. Between 1985 and 1988, Mr. Modanlo also worked as a research associate and taught classes at George Washington.

While working on his Doctorate Degree at George Washington, Mr. Modanlo began work, in or about 1985, for TS Infosystem in Lanham, Maryland, where he was initially employed as a Mechanical Engineer and soon thereafter promoted to Manager of the Mechanical Analysis Section. There, he worked on space projects for the NASA Goddard Space Flight Center. In or about 1988, Mr. Modanlo left TS Infosystem and began work at EER Systems, another NASA contractor, as Manager of the Mechanical System Division. There, he worked on a number of other NASA projects and received an Achievement Award from NASA for his work on the Broad Band X-Ray Telescope.

---

[2] The PSR (at ¶¶ 85 - 98) also discusses Mr. Modanlo's background and personal characteristics.

Mr. Modanlo subsequently founded Final Analysis, Inc. ("FAI") in early 1992. From 1992 until its bankruptcy in September 2001, Mr. Modanlo served as FAI's President. In 1993, Mr. Modanlo co-founded Final Analysis Communication Services, Inc. ("FACS"). He served as its President and Chairman until at least 2006, when FACS was placed into bankruptcy.[3] During this time, and under Mr. Modanlo's leadership, FAI and FACS employed dozens of employees and contractors, and became a world recognized leader in the space and telecommunications industries. By way of example, in an article in the January 19, 1999 edition of *The Daily Record*, a true and correct copy of which is annexed as Exhibit B, James Finley, the former President of General Dynamics Information Systems, described FACS as "entrepreneurial, innovative and with the right vision and approach to the market," and in an article in the August 27 - September 2, 1999 edition of the *Washington Business Journal*, a true and correct copy of which is annexed as Exhibit C, Mr. Finley described FACS as a "very visionary company that needs the support of some bigger players." Further, in describing its role in designing and developing portions of the communications payload and Global Positioning System (GPS) for FAI, and its related equity investment in FACS, Frank C. Lanza, Chairman and Chief Executive Officer of L-3 Communications, stated: "We believe that our investment in Final Analysis is the right choice strategic to L-3's sustained growth. And by providing our leading-edge products, we further contribute to the success of the FAISAT enterprise. All in all, it's a win-win for L-3 and the FAISAT team." See July 17, 2000 Press Release, a true and correct copy of which is annexed as Exhibit D. In describing its selection to develop the total network ground infrastructure for the FAISAT global wireless data system being developed by FAI, Rick Ambrose, Vice President of Space Systems for Raytheon's Command, Control, Communication and Information (C3I) Systems, stated: "FAISAT is an extraordinary opportunity for Raytheon to work with Final Analysis and General Dynamics in providing leading-edge wireless data services. Raytheon is impressed by the Final Analysis business model and their focused market implementation plans." See Raytheon Company March 28, 2000 Press Release, a true and correct copy of which is annexed as Exhibit E. Finally, in announcing its collaboration with FAI to provide expanded wireless data communications offerings, Lew Blumstein, Vice President, Distribution and Solutions, for BellSouth Wireless Data stated: "This is an excellent opportunity for BellSouth Wireless Data to get in on the ground floor of potentially groundbreaking services for the wireless industry. Companies need to exchange critical and dynamic information quickly and efficiently with employees, partners and customers who are dispersed throughout the country. The combination of our BellSouth Intelligent Wireless Network with the next-generation satellite technology being developed by Final Analysis and its partners could allow people to do so wirelessly from the palms of their hands no matter where they are in the U.S." See BellSouth Wireless Data December 12, 2000 Press Release, a true and correct copy of which is annexed as Exhibit F.

Not only did FAI and FACS achieve acclaimed industry success, under Mr. Modanlo's leadership those companies went out of their way to assist the United States Government in any way possible. An illustration of this, annexed as Exhibit G is a true and correct copy of an article

---

[3] Mr. Modanlo is currently unemployed and has been for a number of years. However, Mr. Modanlo has never applied for nor received unemployment benefits.

from the December 1 – 7, 1997 edition of *Space News* that describes FACS' plans to use its satellites to gather data for NASA, and annexed as Exhibit H is a true and correct copy of a letter from the United States Ambassador to the 2003 World Radiocommunication Conference ("WRC") in Switzerland to FACS in which the Ambassador thanks FACS for its assistance in the promotion of United States interests at the WRC 2003.

In 1988, Mr. Modanlo married his current wife, Rona Modanlo. Mr. and Mrs. Modanlo have two children. Their son, Aria Sam Modanlo, is currently 22 years old. He graduated from Penn State University in May 2013 and now works and lives in Dallas. Their daughter, Nina Gisele Modanlo, is currently 19 years old. She is a sophomore at Johns Hopkins University studying medicine. Mr. Modanlo is very close to his wife and children. He is a very attentive and hands-on father, speaking to his children daily and encouraging them in their academic and personal pursuits. Mr. Modanlo and his family have lived in the same house in Potomac, Maryland since 1989.

Mr. Modanlo has two sisters -- one who is 54 years old and lives in Iran, and one who is 46 and lives in Virginia -- and one brother, who is 42 and lives in Virginia. All of his siblings are gainfully employed and have no alcohol, substance abuse or mental health issues. Mr. Modanlo maintains a close relationship with his siblings.

By all accounts of those closest to him, Mr. Modanlo has been a solid family man and member of society more generally. He has absolutely no criminal history apart from the case at bar and has no issues with alcohol or substance abuse. In short, he is an educated and stable person who has never and will never pose any threat to himself or other citizens.

## ARGUMENT

As the Court is well aware, in the aftermath of United States v. Booker and its related Supreme Court progeny, the Guidelines, formerly styled as mandatory, are now merely advisory. See, e.g., United States v. Booker, 543 U.S. 220, 246-48 (2005); Gall v. United States, 552 U.S. 38, 46 (2007). The Guidelines are just "the starting point and the initial benchmark," and are "not the only consideration" when the Court is tasked with imposing a sentence. Gall, 552 U.S. at 49. Indeed, the Supreme Court has recognized that the Guidelines amount only to a "rough approximation" of a just and appropriate sentence, and that "[t]he sentencing judge … has 'greater familiarity with … the individual case and the individual defendant before him than the [Sentencing] Commission or the appeals court.'" Kimbrough v. United States, 552 U.S. 85, 109 (2007) (quoting Gall, 552 U.S. at 51-52). Thus, even if the Court were to disagree with all of Mr. Modanlo's arguments as to the appropriate total combined offense level under the Guidelines (as set forth in the October 10 Letter), and agree wholesale with the analysis contained in the PSR, it would be well within its discretion to impose a sentence below the bottom of a prescribed Guidelines range in the interests of fairness, justice, and serving the purposes of sentencing. See, e.g., Kimbrough, 552 U.S. at 108-112 (confirming that, post-*Booker*, District Courts have the discretion to impose sentences below the bottom of Guidelines range); Spears v. United States, 555 U.S. 261, 264-268 (2009) (same; and stating that "a district

court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the 'heartland' to which the Commission intends the Guidelines to apply") (internal quotations omitted).

In this regard, and as discussed in detail below, even in cases where the defendant was convicted of acts far more egregious than those alleged here, such as providing (or attempting to provide) goods and technology to Iran's government or military *in support of its nuclear and/or chemical weapons proliferation efforts*, District Courts have imposed sentences far below those recommended by the PSR's application of the Guidelines.[4] Bearing in mind the reasonable goal of avoiding unwarranted sentencing disparities between similarly situated defendants (see 18 U.S.C. § 3553(a)(6)), the Court should take heed of such similar cases and the sentences imposed when determining an appropriate sentence in this instance.

The greatest disparity between the government / PSR's position and Mr. Modanlo's is with respect to whether the proper base offense level for the IEEPA violations is 14 under § 2M5.1(a)(2) of the Guidelines or 26 under § 2M5.1(a)(1)(B). As addressed further below, our review of sentences imposed in similar cases involving transactions with Iran has revealed myriad situations where a base offense level of 26 was not imposed. For example, in United States v. Mousavi, Criminal Case No. 07-cr-513 (C.D. Cal.), a jury convicted the defendant of (i) Filing False Tax Return, in violation of 26 U.S.C. § 7206(1); (ii) Impeding Administration of Tax, in violation of 26 U.S.C. § 7212; (iii) Violating the IEEPA and ITR; (iv) Procurement of Citizenship Contrary to Law in violation of 18 U.S.C. § 1425(a); and (v) False Statement within the Jurisdiction of the Federal Government in violation of 18 U.S.C. § 1001. In that case, U.S. District Judge Percy Anderson imposed a sentence of 33 months' imprisonment, notwithstanding the PSR's recommendation of, and government's request for, a base offense level of 26 under § 2M5.1 of the Guidelines, and the government's request for an obstruction of justice enhancement under § 3C1.1 -- which, if accepted by the Court and combined together with a one-level multiple-count adjustment, would have resulted in an offense level of 29 and a Guidelines range of 87-108 months' imprisonment. See Government's Sentencing Position Regarding Defendant Seyed Mahmood Mousavi and U.S. District Court for the Central District of California's Judgment and Probation / Commitment Order, true and correct copies of which are annexed as Exhibits I and J; see also "Summary of Major U.S. Export Enforcement, Economic Espionage, Trade Secret and Embargo-Related Criminal Cases" covering the period January 2007 through February 2013 produced by the Department of Justice ("DOJ Index") at 72, a true and correct

---

[4] The PSR's suggested Total Combined Offense Level of 36 is truly shocking when viewed in comparison to the offense levels prescribed by the Guidelines for certain other crimes that are, on their face, wildly more egregious than the conduct Mr. Modanlo has been convicted of. By way of example: (i) a defendant convicted of second degree murder would receive an offense level of 38 under § 2A1.2 of the Guidelines; (ii) a defendant convicted of sexually assaulting a minor would receive a base level offense of 18 under § 2A3.2 of the Guidelines; and (iii) if the September 11, 2001 hijackers had been successfully thwarted by other passengers and tried and convicted in a U.S. District Court, they would have received an offense level of 38 under § 2A5.1 of the Guidelines. When compared with such heinous crimes and their corresponding punishment, it shocks the conscience that Mr. Modanlo, a 53-year-old man, could remain in prison well into his 70s on the PSR's / government's theory of appropriate sentencing.

copy of which is annexed as Exhibit K.  On appeal, the Ninth Circuit affirmed Mousavi's convictions and sentence on all counts, apart from under 18 U.S.C. §§ 1001 and 1425, on which it reversed.  United States v. Mousavi, 604 F.3d 1084 (9th Cir. 2010).

Moreover, this is true even where the goods, technology or services provided were military in nature and/or the recipient(s) of such goods, technology or services posed a potential terrorist and/or military threat.  For example, in United States v. Amirnazmi, Criminal Case No. 08-cr-429 (E.D. Pa.), after an eight-day trial, a jury convicted the defendant of: (i) one count of conspiracy to violate the IEEPA; (ii) three substantive counts of violating the IEEPA; (iii) three counts of lying to federal officials about his involvement with Iranian companies; and (iv) three counts of bank fraud.  See Government's Sentencing Memorandum at 5-6, a true and correct copy of which is annexed as Exhibit L; see also United States v. Amirnazmi, 645 F.3d 564, 571 (3d Cir. 2011).  The defendant's underlying conduct involved entering into contracts with Iranian government officials to supply both chemical-procurement software (Exh. L at 3) and large quantities of chemicals -- some of which had "serious dual-use potential, including use in the manufacture of solid-phase rocket propellants" (Id. at 10) -- to factions of the Iranian government.  According to the government, "[t]he evidence at trial revealed that Amirnazmi worked with and at the express direction of the highest eschelons [sic] of the Iranian government – specifically, President Mahmoud Ahmadinejad and his close advisors – to advance the Iranian petrochemical industry" (Id. at 8), and that he had publicly announced that his ultimate goal was to make Iran an "independent chemical powerhouse." Id. at 8-9; see also 645 F.3d at 567.  Both the Probation Officer and the government recommended a sentence under the Guidelines of 97-121 months' imprisonment.  Exh. L at 1, 6.  Notwithstanding the relatively egregious facts and circumstances that this case presented, and the government's advocacy of a lengthy sentence under the Guidelines, U.S. District Judge Cynthia Rufe ultimately sentenced Mr. Amirnazmi to a prison term of 48 months followed by 3 years of supervised release to run concurrently on all counts.  See Judgment in a Criminal Case of the U.S. District Court for the Eastern District of Pennsylvania, a true and correct copy of which is annexed as Exhibit M.  On appeal, the Third Circuit affirmed Amirnazmi's conviction and sentence.  645 F.3d 564.

Additionally, in United States v. Mohammad Reza Vaghari, Criminal Case No. 08-00693-01 (E.D. Pa.), a jury convicted the defendant of (i) one count of conspiracy to violate the IEEPA and ITR; (ii) two counts of substantively violating the IEEPA; and (ii) one count of naturalization fraud in violation of 18 U.S.C. § 1425.  These counts were premised on the defendant's underlying conduct of engaging in business transactions with an Iranian organization listed as an entity of concern for biological and chemical weapons development by several foreign governments.  See DOJ Index (Exh. K) at 40-41.  Mr. Vaghari's underlying conduct specifically involved the shipment of goods to Iran, and failed attempts to obtain a centrifuge on behalf of Iran.  See United States v. Vaghari, 500 Fed. Appx. 139, 142-43 (3d Cir. 2012).  While the government's briefs and/or correspondence regarding sentencing are not available on PACER, it is clear from Mr. Vaghari's Sentencing Memorandum (at 26-30), a true and correct copy of which is annexed as Exhibit N, that the government was seeking a base offense level of 26 under § 2M5.1 of the Guidelines.  Notwithstanding this, U.S. District Judge Jan DuBois

ultimately imposed a sentence of 33 months' imprisonment followed by 3 years of supervised release to run concurrently on each count.  See Judgment in a Criminal Case of the U.S. District Court for the Eastern District of Pennsylvania, a true and correct copy of which is annexed as Exhibit O. This 33-month sentence included a two-level obstruction of justice enhancement based on the District Court's finding that Vaghari perjured himself during his trial testimony. See 500 Fed. Appx. at 143.  On appeal, the Third Circuit affirmed Vaghari's conviction and sentence on all counts.  Id. at 151.

**A.  A Downward Variance From The Guidelines Will Better Serve The Broad Purposes Of Sentencing.**

After the Court hears argument from both the government and Mr. Modanlo as to which Guidelines should apply and why, it "should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested" by each of the parties.  Gall, 552 U.S. at 49-50.  In doing so, the Court "may not presume that the Guidelines range is reasonable" but rather "must make an individualized assessment based on the facts presented." Id. at 50.  Indeed, a sentence imposed pursuant to the letter of the Guidelines may be inappropriate, particularly where "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply..., perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless..." Rita v. United States, 551 U.S. 338, 351 (2007).  This is one of those cases.

Sentencing a defendant to a term of prison is not something that is done in a vacuum; a sentencing Court should be ever-mindful of the larger societal purposes of sentencing.  "The court shall impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes" of sentencing, which are:

> the need for the sentence imposed --
>
> (A) to reflect the seriousness of the offense, to promote respect for the rule of law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2) (emphasis added).  Relatedly, the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the kinds of sentences available."  18 U.S.C. § 3553(a)(3).

> 1. **The Nature, Circumstances, And Seriousness Of The Offense Militate In Favor Of A Downward Variance.**

Both "the nature and circumstances of the offense…," 18 U.S.C. § 3553 (a)(1), and the need for a sentence to "reflect the seriousness of the offense...," 18 U.S.C. § 3553(a)(2)(A), militate in favor of a downward variance from the Guidelines.  The Court should keep in mind that Mr. Modanlo is charged with working to facilitate the launch of a satellite that was wholly non-military in nature, and that no one (American or otherwise) was subjected to any harm, or increased risk of harm, due to Mr. Modanlo's purported wrongful conduct.  See, e.g., Transcript of May 16, 2013 Trial Proceedings (relating to Mr. Vann Van Diepen's testimony) at 6:6-9, a true and correct copy of which is annexed as Exhibit P ("THE COURT: … In candor, I don't think it's fair to say that somehow this defendant is charged with opening the door to military surveillance or all that kind of satellite.").

> a. **Base Offense Level**

As discussed at some length in the October 10 Letter (at 2-4), the proper base level offense for these particular violations of the IEEPA is 14 under U.S.S.G. 2M5.1(a)(2) due, in short, to the facts that Mr. Modanlo's purported improper activities did not involve the Iranian military, were entirely unrelated to Iran's military capabilities, and had nothing to do with terrorism.  For the reasons discussed herein, a downward variance is appropriate even assuming a total combined offense level of 16.[5]

Were the Court to reject defendant's arguments and agree that the proper base level offense is 26 under § 2M5.1(a)(1)(B) of the Guidelines, as advocated by the PSR and government, a downward variance as to this individual Guideline would be particularly crucial.  This is so because Application Note 4 of this Guideline refers solely to section 6(j) of the Export Administration Act (50 U.S.C. App. § 2405) (the "EAA") to provide meaning to the phrase "a country supporting international terrorism."  The legislative history of the EAA indicates quite clearly that Congress intended it, by and large, to encompass the export of *militaristic* goods and technologies to foreign governments supporting terrorism (see October 10 Letter at 2-4).  In sum, the goal of the legislation was to curtail the export of military goods to terrorist countries that they could use for terrorist purposes.

In the PSR, Ms. Brewster essentially ignores the legislative history of the EAA indicating that the crux of the legislation underpinning § 2M5.1(1)(B) was to curtail the supply of militaristic goods to certain foreign governments and militaries supporting terrorism.  See PSR at

---

[5] The additional two levels are the result of the enhancement resulting from a conviction under 18 U.S.C. § 1956 pursuant to U.S.S.G. § 2S1.1(b)(2)(B).

35-36. The government has produced absolutely no evidence that Mr. Modanlo had any dealings with any member of the Iranian military or that the satellite technology at issue here was or could be used for any military purpose. Indeed, the Court itself has previously noted the absence of any connection between the transactions at issue and the Iranian military and/or terrorism in ruling on Mr. Modanlo's motion to limit the scope of the testimony of Mr. Vann Van Diepen, a government expert witness from the State Department:

> THE COURT: Is he intending to say anything about how this project, assuming that the conclusion -- there's something that links the defendant with the satellite launch in Iran somehow has military capabilities or links up to a military project or anything?
>
> MR. SALEM: No, I'm not planning on --
>
> THE COURT: Is there something beyond that that troubles you, Mr. Outlaw?
>
> MR. OUTLAW: Well, a couple things Your Honor. One is, according to the note and I don't have it right in front of me, but my recollection of the notice for Mr. Van Diepen is that he was also going to testify that, basically, this kind of satellite technology is dual use technology; that this kind of -- getting the satellite opens the door to military --
>
> THE COURT: Yeah, I thought that's what I read too. That's why I'm asking. You're not intending to say that, I assume.
>
> *I don't think it's fair. In candor, I don't think it's fair to say that somehow this defendant is charged with opening the door to military surveillance or all that kind of satellite.*

Exh. P, at 5:14 – 6:9 (emphasis supplied).

Similarly, the Court limited the testimony of another government witness, Elroy "Gene" Christianson:

> MR. MILLER: …. The next problem is this line that says that this type of satellite was controlled for national security and antiterrorism reasons.
>
> Now, surely, that is prejudicial. There is no allegation that Mr. Modanlo was involved in terrorism. There is no allegation that the satellite was used for terrorism, so I just think that that's

> just in there to be playing to the passions of the jury. I don't think
> there is anything relevant about that whatsoever.
>
> …………
>
> THE COURT: It's sort of somewhat relevant as a run up
> to the time that's in question. We didn't have a lot of trouble with
> the earlier references to transactions between FAI and the
> Russians, which were in the same time frame. That's all this does.
>
> *I agree with you on any reference to Iran and any reference
> to terrorism or whatever.*

Excerpt of May 9, 2013 Trial Testimony (relating to the testimony of Mr. Christianson, a true and correct copy of which is annexed as Exhibit Q, at 5:1-11; 7:4-10 (emphasis supplied). As a result, the government redacted, among other things, the following strike-through text:

> ECCN 9A04 was controlled ~~for National Security and Anti-Terrorism reasons~~ and required a license for export to all countries except Canada.

*Compare* Exh. R (original undredacted version of Govt. Exh. License 1) *with* Exh. S (redacted Govt. Exh. License 1 admitted into evidence).

      Mr. Modanlo's purported wrongful acts -- involving a non-military satellite -- decidedly fall outside of the "heartland" of subsection (a)(1)(B) based on a review of its legislative history. See Rita, 551 U.S. at 351. Moreover, according to the PSR itself, the $10 million loan underlying the violation of 50 U.S.C. § 1705(b) did not come from the government of Iran. See PSR at ¶ 35 (identifying the sources of the $10 million as, in part, the sale of real property in Iran). Nor is there any evidence in the trial record indicating that the $10 million came from the government of Iran. Indeed, it is illogical that the government of Iran would need to sell real property to finance its satellite program. Recognizing this problem, the government argued for and the Court provided an instruction to the Jury that "[i]t is not necessary for the government to prove that the services were directly provided to Iran of the Government of Iran." See Jury Instruction 51. Now, the government asks for a specific finding that the government of Iran was behind the underlying transactions. As a result, Mr. Modanlo should receive a base level offense of 14 under subsection (a)(2). However, in the event the Court were to adopt the PSR's interpretation of the Guidelines so as to apply a base level offense of 26 under subsection (a)(1)(B), a downward variance would be particularly crucial and appropriate.

      **b.**     **PSR's Recommended Upward Adjustments**

      With respect to the upward sentencing adjustments advocated by the PSR and government, said adjustments are inappropriate here for the reasons set forth in detail in the October 10 Letter (at 4-11). In the alternative, should the Court conclude that such upward

adjustments are permissible under the Guidelines, a downward variance with respect both to these adjustments and the base levels for the respective underlying offenses is entirely warranted under the facts here.

     First, as to the four level enhancement under U.S.S.G. § 3B1.1(a) for Mr. Modanlo's purported "leadership" role (See October 10 Letter at 8-10), the evidence simply fails to support any inference that Mr. Modanlo occupied such a position. At best, the evidence paints a picture of a middleman acting at the direction of others. Pursuant to the government's brokering theory, Mr. Modanlo was brokering an agreement at the behest of the Iranians to help the Iranians realize their goal of launching a satellite. The term "broker" implies as much. With respect to Mr. Modanlo's alleged attempts to acquire telecommunications licenses for Prospect Telecom, again, Mr. Modanlo was allegedly working under the direction of the Iranians. Mr. Modanlo did not exercise authority over others. Authority was exercised over him. Again, according to the government, Mr. Modanlo was paid to do what others asked him to do -- the Iranians did not pay him to be their leader.

     Next, regarding the two level enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice (See October 10 Letter at 10-11), the obstructive conduct must have occurred "with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. Only in very limited circumstances will Courts apply the § 3C1.1 enhancement based on a defendant's misstatements (or other obstructive conduct) made outside the context of the instant criminal proceeding, namely, where the obstructive conduct occurs in proceedings (or other circumstances) so closely related to the criminal investigation and prosecution that defendant could have acted for no other purpose than thwarting the instant criminal prosecution. Here, the government never alleged that Mr. Modanlo did or said anything to obstruct the instant criminal proceeding; rather, Count 11 of the Indictment alleges that Mr. Modanlo's alleged misstatements obstructed his and NYSI's bankruptcy proceedings. See Indictment at 26-34. Indeed, given that Mr. Modanlo's alleged misstatements occurred years prior to the instant criminal proceeding, it cannot be said that any purportedly obstructive behaviour had no other purpose than to thwart the instant criminal prosecution. The PSR (at 37) entirely misapprehends the law on this point, contending that because there is some theoretical connection between the misstatements and the money laundering Counts, the enhancement is appropriate. But it cannot possibly be established that the misstatements, made years previously in the unrelated bankruptcies, were made for no other purpose than to thwart the instant criminal prosecution, as the law requires. Both the Fourth Circuit and other Courts of Appeal have made clear that an enhancement under § 3C1.1 should not apply where the alleged obstruction occurred outside of the context of the *instant* criminal proceeding. See, e.g., United States v. Gibson, 972 F.2d 343 at *2 (4th Cir. 1992) (holding that alleged perjury committed at separate trial could not form basis of § 3C1.1 enhancement); United States v. Clayton, 172 F.3d 347, 355 (5th Cir. 1999) (application of § 3C1.1 enhancement appropriate only where obstructive conduct

"occurs, in the words of the guideline, *during* an investigation of the defendant's instant offense") (emphasis in original).[6]

Finally, with respect to the two level enhancement for "sophisticated laundering" under U.S.S.G. § 2S1.1(b)(3) (See October 10 Letter at 4-8), because the offensive conduct was not "complex or intricate" within the meaning of this Guideline, the Court should not impose this enhancement. As Comment 5(A) to § 2S1.1(b)(3) explains, 'sophisticated laundering' means "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. 1956 offense," and "typically involves the use of: (i) fictitious entities; (ii) shell

---

[6] In arguing that Mr. Modanlo should receive an enhancement under § 3C1.1 of the Guidelines based on obstructive conduct that occurred during the entirely separate and unrelated bankruptcy proceeding, the government attempts to support its untenable position by citing to two Fourth Circuit cases that are easily distinguishable from the situation at bar.

First, it cites United States v. Thorson, 633 F.3d 312 (4th Cir. 2011). See Government Letter at 24. In Thorson, the defendant was convicted on one count of conspiring to defraud the United States of tax revenue and three counts of aiding and assisting in the preparation of false income tax returns based on his participation in a complicated tax fraud scheme involving the purchase and donation of cemetery plots in an effort to claim improper tax deductions. See 633 F.3d at 314 – 316. In an effort to conceal his wrongdoing, the defendant submitted falsified documents both in response to the IRS' civil audit, and in response to a grand jury subpoena at the outset of the criminal case. Id. at 316. Among other enhancements, the District Court imposed a two-level increase under § 3C1.1. Id. at 320 – 322. Given that the defendant submitted falsified documents in response to *both the civil and criminal* investigations into the same underlying misconduct (i.e., tax fraud) and the civil and criminal investigations were pending simultaneously, Mr. Thorson, unlike Mr. Modanlo, would have had no credible argument that his obstructive conduct did not occur "with respect to the investigation, prosecution, or sentencing of the *instant offense of conviction*" within the meaning of § 3C1.1. "As the IRS audit and grand jury investigation both constituted investigations of his offense, we find no error in the district court's application of the enhancement…" Id. at 321. In this instance, violations of the IEEPA / ITR had absolutely no bearing on the bankruptcy proceeding and the Bankruptcy Court had absolutely no role in investigating or prosecuting such violations, as Mr. Lynn Kohen, the United States Trustee managing the underlying bankruptcy proceeding, unequivocally testified. See May 15, 2013 Trial Transcript, true and correct copies of the relevant pages of which are annexed as Exhibit T, at 54:25 – 56:9.

Second, the government cites United States v. Hughes, 401 F.3d 540 (4th Cir. 2005). See Government Letter at 24. In Hughes, the defendant was convicted on three counts of bankruptcy fraud and two counts of perjury based on his filing of falsified documents in his wife's Chapter 11 proceeding, and on false testimony he provided during that proceeding. See 401 F.3d at 544. Among other enhancements, this Court imposed a two-level increase under § 3C1.1. Id. at 544. In addition to an unsuccessful "double-counting" argument, the defendant also unsuccessfully argued that "his perjurious statements were made in the bankruptcy court, not the district court, and therefore fall outside the scope of the 'investigation, prosecution, or sentencing of the *instant offense* of conviction.'" Id. at 559. In upholding the § 3C1.1 enhancement, the Fourth Circuit paid heed to this Court's finding that "[t]he whole transaction involving the defendant was being investigated by [the bankruptcy court]." Id. This is plainly not the situation in the case at bar, as the obstructive statements at issue were made in response to Mr. Mead's (the bankruptcy trustee) inquiries into certain payments made to Prospect Telecom, *not* IEEPA and/or ITR violations -- i.e., not the "instant offense of conviction" within the meaning of § 3C1.1. Indeed, during Mr. Modanlo's trial, Lynn Kohen, the attorney for the bankruptcy trustee, herself testified as to the utter lack of a connection between the bankruptcy proceeding and any criminal investigation into IEEPA / ITR violations. See Exh. T at 54:25 – 56:9. Thus, neither Thorson nor Hughes support the government's strained and overzealous attempt to hit Mr. Modanlo with an obstruction enhancement.

corporations; (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts."  Here, the evidence substantially favours the conclusion that Prospect Telecom was a legitimate company that provided a legitimate loan to NYSI, and not a "fictitious entity" or "shell."  Next, Mr. Modanlo did not use "two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate."  The $10 million was wired to NYSI's sole bank account in a single wire transfer.  Once the $10 million was transferred into NYSI's bank account in Maryland, it is undisputed that Mr. Modanlo did absolutely nothing insidious to attempt to hide either the origin of the funds or subsequent transfers to FACS.  Moreover, Mr. Modanlo did not make use of any offshore financial accounts to attempt to conceal the funds.  Although the money came from a Swiss company, it was deposited into a domestic bank account and used to pay the legitimate expenses of FACS.  Last, but not least, there was no evidence -- or even any allegation -- that Mr. Modanlo personally benefited from or received any portion of this loan.[7]

> 2. **Mr. Modanlo's History And Characteristics, And The Lack Of Any Serious Deterrence Or Public Safety Concerns Militate In Favor Of A Downward Variance.**

Apart from "the nature and circumstances of the offense," a District Court is also to consider the need for the sentence imposed to: "(B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  See 18 U.S.C. § 3553(a)(2).

---

[7] Finally, in connection with conviction on Count 11 (obstruction of official proceeding), which is grouped into Count 5 pursuant to § 3D1.2(c) (see PSR at ¶ 55), the government confusingly notes a purported "3-level enhancement under § 2J1.2(b)(2) because the offense resulted in a substantial interference with the administration of justice, in the form of 'unnecessary expenditure of substantial governmental or court resources' by the United States Trustee."  Government Letter at 24.   The PSR reasonably makes no reference to this point, as it boggles the mind and defies commonsense to suggest that a defendant should receive additional enhancement points on a Count that has essentially been merged out of existence into the most serious of the counts (Count 5) under § 3D1.2(c).  That being said, even if a potential enhancement under § 2J1.2(b)(2) were in play (which it is not), it would be incumbent upon the government to: "(1) identify a particular expenditure of governmental resources (time or money), (2) which but for the defendant's conduct would not have been expended, and (3) was 'substantial' in amount."  United States v. Thackett, 193 F.3d 880, 886-87 (6th Cir. 1999).  Flatly and without any explanation insinuating that this enhancement might apply simply does not cut the mustard.  Further, Mr. Mead's (the Bankruptcy Trustee) ultimate goal in "determin[ing] the true facts concerning Modanlo's dealings with Prospect Telecom" (Government Letter at 24) was to avoid preferential transfers made to the company in advance of the bankruptcy proceeding.  Given that these transactions occurred within 90 days of the date of the filing of the bankruptcy petition, they were automatically voidable as preference payments under 11 U.S.C. § 547, and there was absolutely no need for Mr. Mead to embark on an investigation of "Modanlo's dealings with Prospect Telecom" to void such transactions.

As to the factor regarding deterrence under 18 U.S.C. § 3553(a)(2)(B), Mr. Modanlo is a reasonable, educated man who is very close with his family. If the Court were to downwardly adjust his sentence from that contemplated by the advisory Guidelines, or indeed to impose a sentence that does not involve imprisonment at all, the risk of recidivism is essentially non-existent. Mr. Modanlo, being a family man with a relatively stable and comfortable life, would have very little to gain and very much to lose should he ever in the future engage in the type of behavior at issue in this case, or any other criminal behavior for that matter. As his wife, Rona, attested to Probation Officer Brewster, Mr. Modanlo's life "is in ruins" because of this case. (PSR at ¶ 87). He is thus highly unlikely to commit any crimes in the future and thereby run the risk of putting himself and his loved ones through the same turmoil again. Indeed, Mr. Modanlo is simply not in any position to engage in like criminal activity. He is currently unemployable in the aerospace industry. In sum, there are no deterrence concerns as to Mr. Modanlo himself.

As to the deterrence effect Mr. Modanlo's sentence might have on others predisposed to partaking in activity similar to that implicated here -- i.e. violating the IEEPA by transacting with Iranians -- one must first assume that such individuals will become aware of and actively consider Mr. Modanlo's case in order for deterrence, in this context, to be a serious consideration. Assuming, arguendo, that such people would be aware of Mr. Modanlo's sentence and that this awareness might potentially alter their behavior, they would likely also be aware of the plethora of similar cases discussed herein (at infra 15-19, and supra 5-7), in which similarly situated defendants, and even those convicted of far more egregious acts, were punished relatively minimally, and would consider a punishment in line with that advocated by the PSR and government to be an outlier.

As to factor (C) and its concern with potential harm to the public, a reduced term of imprisonment from that contemplated by the Guidelines, or a sentence not involving imprisonment at all, would not subject the public to any risk. As discussed above and in the October 10 Letter, Mr. Modanlo's purported wrongful activities at issue in this case involved non-military satellites. Thus, the public was never harmed by Mr. Modanlo's purported activities or subject to any increased risk of harm. And again, because Mr. Modanlo's recidivism risk is next to nothing, he poses no threat to the public going forward.

Finally, under factor (D), incarceration, especially a lengthy one, will simply not provide "correctional treatment in the most effective manner possible." Indeed, far from rehabilitating and improving Mr. Modanlo, a lengthy period of incarceration will likely have the exact opposite effect.

As Justice Stevens recognized in his concurrence in Rita, "many individual characteristics ... are not ordinarily considered under the Guidelines," but are nonetheless "matters that § 3553(a) authorizes the sentencing judge to consider." 551 U.S. at 364-65. Once again, "[t]he sentencing judge … has 'greater familiarity with … the individual case and the individual defendant before him than the [Sentencing] Commission or the appeals court.'" Kimbrough, 552 U.S. at 109 (quoting Gall, 552 U.S. at 51-52). In this instance, consideration of the individual characteristics of both Mr. Modanlo and the unlawful activities at issue in this case

militates in favor of a downward variance from the harsh sentence that the Guidelines alone (certainly under the PSR's and the government's interpretation) would have the Court impose.

B.  **A Downward Variance From The Guidelines Will Help Avoid Unwarranted Sentencing Disparities Vis-à-Vis Similarly Situated Defendants.**

Sentencing courts are instructed to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A review of the DOJ Index (Exh. K) reveals a number of cases involving transactions with Iran. These cases, along with certain other publicly-available cases involving IEEPA violations related to the ITR that we were able to locate, establish that the sentence the PSR recommends and that the government advocates for is extraordinarily harsh in comparison to recent sentences imposed upon similarly situated defendants (and, indeed, those who have engaged in far more reprehensible conduct) who have transacted with Iran in violation of the IEEPA and/or other similar export control statutes.

Again, it is important to keep in mind that the satellite Mr. Modanlo purportedly brokered the launch of was entirely non-military in nature, Mr. Modanlo had absolutely no contacts or dealings with any members of the Iranian military and absolutely no benefit accrued to the Iranian military. Even in cases involving defendants who have exported goods and technology to Iran's military *in support of its nuclear and/or chemical weapons proliferation efforts*, the sentences imposed by other Federal Courts are not even in the ballpark of what the PSR (and the government) is suggesting for Mr. Modanlo.

    1.    Cases Involving Military, Chemical or Nuclear Related Goods or Technologies:

(i) In January 2010, the United States District Court for the Eastern District of Pennsylvania sentenced defendant Ali Amirnazmi to forty-eight (48) months' imprisonment followed by three (3) years of supervised release after a jury convicted him after an eight-day trial, a jury convicted the defendant of: (i) one count of conspiracy to violate the IEEPA; (ii) three substantive counts of violating the IEEPA; (iii) three counts of lying to federal officials about his involvement with Iranian companies; and (iv) three counts of bank fraud. See Exh. L at 5-6; see also Amirnazmi, 645 F.3d at 571. The defendant's underlying conduct involved entering into contracts with Iranian government officials to supply both chemical-procurement software (Exh. L at 3) and large quantities of chemicals -- some of which had "serious dual-use potential, including use in the manufacture of solid-phase rocket propellants" (Id. at 10) -- to factions of the Iranian government. According to the government, "[t]he evidence at trial revealed that Amirnazmi worked with and at the express direction of the highest eschelons [sic] of the Iranian government – specifically, President Mahmoud

Ahmadinejad and his close advisors – to advance the Iranian petrochemical industry" (Id. at 8), and that he had publicly announced that his ultimate goal was to make Iran an "independent chemical powerhouse." Id. at 8-9; see also 645 F.3d at 567. Both the Probation Officer and the government recommended a sentence under the Guidelines of 97-121 months' imprisonment. See Exh L at 1, 6. Notwithstanding the relatively egregious facts and circumstances that this case involved, and the government's advocacy of a lengthy sentence under the Guidelines, U.S. District Judge Cynthia Rufe ultimately sentenced Mr. Amirnazmi to a prison term of 48 months followed by 3 years of supervised release to run concurrently on all counts. See Exh. M. On appeal, the Third Circuit affirmed Amirnazmi's conviction. 645 F.3d 564.

(ii) In June 2011, the United States District Court for the Eastern District of Pennsylvania sentenced defendant Mohammad Reza Vaghari to thirty-three (33) months' imprisonment after a jury convicted him of (i) one count of conspiracy to violate the IEEPA and ITR; (ii) two counts of substantively violating the IEEPA; and (ii) one count of naturalization fraud in violation of 18 U.S.C. § 1425. These counts were premised on the defendant's underlying conduct of engaging in business transactions with an Iranian organization listed as an entity of concern for biological and chemical weapons development by several foreign governments. See Exh. K at 40-41. Mr. Vaghari's underlying conduct specifically involved the shipment of goods to Iran, and failed attempts to obtain a centrifuge on behalf of Iran. See Vaghari, 500 Fed. Appx. at 142-43. The government sought a base offense level of 26 under § 2M5.1 of the Guidelines. See Exh. N at 26-30. Notwithstanding this, U.S. District Judge Jan DuBois ultimately imposed a sentence of 33 months' imprisonment followed by 3 years of supervised release to run concurrently on each count. See Exh. O. This 33-month sentence included a two-level obstruction of justice enhancement based on the District Court's finding that Vaghari perjured himself during his trial testimony. See, 500 Fed. Appx. at 143. On appeal, the Third Circuit affirmed Vaghari's conviction on all counts. Id. at 151.

(iii) In June 2010, the United States District Court for the District of Columbia sentenced defendant Hossein Ali Khoshnevisrad to a total of thirty (30) months' imprisonment where his illegal activities included the exportation of aircraft engines and advanced surveillance cameras to the Iranian military. See Exh. K at 68-69.

(iv) In July 2010, the United States District Court for the Southern District of Florida sentenced defendant Baktash Fattahi to thirty-five (35) months' imprisonment where his illegal activities included the exportation of U.S.-made military aircraft parts to Iran in violation of the IEEPA. See Exh. K at 67.

(v) In May and June 2009, the United States District Court for the Southern District of Florida sentenced defendants Hassan Keshari and Traian Bujduveanu, respectively, to seventeen (17) and thirty-five (35) months' imprisonment for their roles in a conspiracy to export military and commercial aircraft components to Iran. See Exh. K at 65.

(vi) In August 2010, the United States District Court for the Southern District of Florida sentenced defendant Yi-Lan Chen to forty-two (42) months' imprisonment for his role in exporting missile components to Iran.  In September 2011, Mr. Chen received a downwardly-amended sentence of time served, two (2) years of supervised release, and a $300 special assessment. See Exh. K at 56.

(vii) In June and October 2011, the United States District Court for the Middle District of Georgia sentenced Hamid Seifi and Michael Edward Todd, two U.S.-based defendants who had conspired with others located in France, the U.A.E. and Iran, respectively, to fifty-six (56) months' imprisonment followed by three (3) years of supervised release, and forty-six (46) months' imprisonment, as well as fines and forfeiture payments, for their roles in the exportation of military aircraft components to Iran.  These defendants were charged with violating the Arms Export Control Act and the IEEPA, as well as conspiracy to defraud the United States, money laundering and false statement violations.  See Exh. K at 40.

(viii) In October 2012, the United States District Court for the Western District of Texas sentenced defendant Susan Yip to two (2) years' imprisonment for her role in a conspiracy to violate the Iranian Trade Regulations, to launder money, and to commit wire fraud, which involved the export to Iran of components that could be used in military systems such as nuclear weaponry and missile guidance and development, among other things.  See Exh. K at 11.

    (ix)    In August 2011 and November 2012, the United States District Court for the Northern District of Illinois sentenced defendants Davoud Baniameri and Andro Telemi, respectively, to fifty-one (51) months' imprisonment, and five (5) years' probation with six (6) months of home confinement and a $10,000 fine, in connection with their roles in a conspiracy to export missile components to Iran.  See Exh. K at 17-18.

In cases involving transactions with Iran that do not involve goods and technologies having military uses, the disparities between the sentences these defendants received and what the PSR recommends are, in some instances, even starker.

    2.    <u>Cases Involving Non-Militaristic Goods, Technologies or Services:</u>

    (i)    In October 2008, the United States District Court for the Central District of California sentenced defendant Seyed Mahmood Mousavi, a former interrogator for the Islamic Revolutionary Court in Iran, to thirty-three (33) months' imprisonment and a $12,500 fine after a jury convicted him of (i) Filing False Tax Return, in violation of 26 U.S.C. § 7206(1); (ii) Impeding Administration of Tax, in violation of 26 U.S.C. § 7212; (iii) Violating the IEEPA and ITR; (iv) Procurement of Citizenship Contrary to Law in violation of 18 U.S.C. § 1425(a); and (v) False Statement within the Jurisdiction of the Federal Government in violation of 18 U.S.C. § 1001.  In that case, U.S. District Judge Percy Anderson imposed a sentence of 33 months' imprisonment notwithstanding the PSR's recommendation of, and government's request for, a base offense level of 26 under § 2M5.1 of the Guidelines, and the government's request for obstruction of justice enhancement under § 3C1.1 -- which, if accepted by the Court and combined together with a one-level multiple-count adjustment, would have resulted in an offense level of 29 and a Guidelines range of 87-108 months' imprisonment.  See Exhs. I, J, and K at 72.  On appeal, the Ninth Circuit affirmed Mousavi's convictions on all counts, apart from under 18 U.S.C. §§ 1001 and 1425, on which it reversed. <u>Mousavi</u>, 604 F.3d 1084.

    (ii)    In August 2010, the United States District Court for the Southern District of New York sentenced defendant Mahmoud Reza Banki to thirty (30) months' imprisonment followed by three (3) years of supervised release after a jury convicted him of violating the IEEPA and ITR in connection with conducting an unlicensed money transmitting business that facilitated the transfer of funds

between individuals in the United States, including defendant, and individuals in Iran. See Judgment in a Criminal Case of the United States District Court for the Southern District of New York, a true and correct copy of which is annexed as Exhibit U.

(iii) In May 2008, the United States District Court for the Eastern District of New York sentenced defendant Patrick Gaillard to one (1) month in prison, three (3) years' supervised release, and a $25,000 fine for his violation of the IEEPA in connection with the planned export to Iran, via a trading company in the U.A.E., of restricted test tube and microplate coating systems, which had a wide variety of research and laboratory uses. See Exh. K at 79.

(iv) In May 2008, the United States District Court for the Southern District of Georgia sentenced defendant Afshin Rezaei to six (6) months' imprisonment and forfeiture of $50,000 for violation of the IEEPA in connection with the unlicensed export of computers to Iran via the U.A.E. See Exh. K at 79.

(v) In August 2008, the United States District Court for the Eastern District of Louisiana sentenced defendants James Angehr and John Fowler to five (5) years' probation, a fine of $250,000, and forfeiture of $218,583 for violating the IEEPA in connection with a plot to export controlled engineering software to Iran through their jointly-owned company, Engineering Dynamics, Inc. See Exh. K at 75-76.

(vi) In May 2012, the United States District Court for the District of New Jersey sentenced defendant Ulrich Davis to six (6) months' imprisonment for his role in facilitating the illegal export of aircraft components to Iran. See Exh. K at 21.

This sampling of cases makes it abundantly clear that the lengthy term of imprisonment recommended in the PSR and advocated by the government is, to say the least, an overzealous application of the Guidelines. Indeed, after viewing these similar -- and in many instances far more egregious -- cases and the sentences imposed, it seems that the only conceivable rationale for imposing the type of sentence advocated in the PSR would be to harshly punish Mr. Modanlo for forcing the government to prove its case against him each step of the way -- as was his constitutional right. Of course, it is axiomatic that one may not be overzealously punished for exercising a constitutional right. See, e.g., United States v. Goodwin, 457 U.S. 368, 372 (1982) ("For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right.") (citations omitted); Patton v. State of N.C., 381 F.2d 636, 640 (4th Cir. 1967) ("this circuit has already held

it impermissible to force upon an accused the risk of a more severe punishment as a condition for securing a constitutional right") (citations omitted).

As set forth in 18 U.S.C. § 3553(a)(6), the Court should endeavor to avoid unwarranted and inequitable sentencing disparities in relation to defendants who committed similar -- and in many instances far more egregious -- underlying criminal acts. Thus a downward variance from the Guidelines is entirely appropriate -- and particularly so if the Court were to adopt (in whole or in part) the PSR's view of which Guidelines and/or sentence enhancements apply.

## CONCLUSION

For the reasons set forth above and in the October 10 Letter, Mr. Modanlo's Total Combined Offense Level under the Guidelines should be no higher than 16. Moreover, a downward variance from a purely Guidelines-based sentence is entirely appropriate, and particularly appropriate should the Court adopt, in whole or in part, the PSR's interpretation of the Guidelines.

Respectfully,

*/s/ James J. McGuire*

James J. McGuire

Encl.

cc:  AUSA David Salem (by e-mail with enclosure)
     United States Probation Officer Mary Brewster (by e-mail with enclosure)